LEGGETT *v.* STATE.

4960                                          328 S. W. 2d 252

Opinion delivered October 19, 1959.

[Rehearing denied November 16, 1959]

14

*Kenneth Coffelt,* for appellant.

*Bruce Bennett,* Atty. General by *Thorp Thomas,* Asst. Atty. General, for appellee.

ED. F. McFADDIN, Associate Justice. This is another chapter in the litigation involving Emmett Earl Leggett, convicted in the Pulaski Circuit Court in 1956 for the murder of Joe King, and sentenced to death.

The judgment in the murder case was affirmed by this Court on February 18, 1957. See *Leggett* v. *State,* 227 Ark. 393, 299 S. W. 2d 59, and hereinafter referred to as the "first case". Leggett later filed in the Pulaski Circuit Court a proceeding under the then existing Uniform Post Conviction Procedure Act (being Act No. 419 of 1957 and found in § 43-3101 Ark. Stats.).[1] That proceeding was unsuccessful when on March 31, 1958 we affirmed the Circuit Court judgment which denied Leggett the relief sought. See *Leggett* v. *State,* 228 Ark. 977, 311 S. W. 2d 521, and hereinafter referred to as the "second case". Leggett then filed in the Jefferson Circuit Court a petition against Lee Henslee, Superintendent of the Arkansas State Penitentiary. The relief sought was a writ of mandamus to require a jury to be empanelled to investigate Leggett's sanity. From an adverse judgment in the Circuit Court, Leggett again appealed to this Court and was again unsuccessful, when

---

[1] This Act was subsequently repealed by Act No. 227 of 1959.

on March 9, 1959 we affirmed the Jefferson Circuit Court judgment. See *Leggett* v. *Henslee,* 230 Ark. 183, 321 S. W. 2d 764, and hereinafter referred to as the "third case".

With the court proceedings thus concluded, the Governor of Arkansas, in accordance with the law (§ 43-2623 Ark. Stats.), set the date for Leggett's execution to be July 24, 1959. But on July 23rd Leggett filed in the Pulaski Circuit Court a pleading entitled, "Motion to Stay the Judgment of Death Sentence and Electrocution Ordered Thereunder", and in that pleading it was claimed, *inter alia*:

"Since the original trial in this case and since the affirmance by the Supreme Court of Arkansas of the original trial record and the sentence imposed in this case, there has been newly discovered evidence, to-wit:

"At the request of state officers and officials, impartial psychiatrists were prevailed upon to examine the defendant as to his sanity. They filed a written report addressed to the Governor of Arkansas which states that the defendant is insane and was insane at the time of the commission of the offense as charged herein. A copy of said report is attached hereto, marked Exhibit 'A', and made a part hereof. The State of Arkansas although having acquired this information at its own request has denied the availability of this newly discovered evidence to a jury of defendant's peers. The defendant in this case was defended as a pauper in the original trial and had no way of acquiring at the time of the trial this additional evidence. Before the additional evidence was discovered at the instigation and request of the State the time had expired for the defendant to ask for a new trial by reason of such newly discovered evidence."

On the same day (July 23, 1959) the Pulaski Circuit Court entered "Final Judgment", which recited no appearance by anyone for the State, but which de-

nied Leggett's motion.[2]  The same day — July 23, 1959 — the transcript of the said Pulaski Circuit Court proceedings was lodged in the office of the Clerk of the Arkansas Supreme Court.  The Court was in vacation (having adjourned in June to August), and Justice JIM JOHNSON granted the appeal of Leggett and forthwith issued a stay of execution to the Superintendent of the Penitentiary.[3]  The Superintendent of the Penitentiary honored the stay order; and the correctness of such stay order is now before us in this case,[4] hereinafter referred to as the "present case".

---

[2] The entire text of this judgment was as follows: "On this 23rd day of July, 1959, is presented to the court the written verified motion of the defendant with the exhibits attached thereto, praying that this court stay the judgment of the death sentence imposed on the defendant herein, and the electrocution ordered thereunder; and the court after reading said motion and the exhibits, and after being well and sufficiently advised as to all matters of law and fact pertaining hereto, finds:
"That said motion should be denied.
"WHEREFORE, it is the final order and judgment of this court that the motion of the defendant praying that the death sentence imposed on the defendant herein, and his electrocution ordered thereunder be stayed, be, and the same is, hereby denied, and the defendant duly excepts to this judgment and prays an appeal to the Supreme Court of Arkansas which appeal is hereby granted by the court. It is so ordered."

[3] Justice Johnson wrote the following, which is affixed to the transcript: "The defendant and his rights are again squarely before this Court. I am called upon by an earnest plea from his counsel to grant a temporary stay of his execution until this case can be presented to the full court on its merits. Serious allegations are made in this record that the State itself, since the original trial, has acquired newly discovered evidence that the defendant is insane which has never been considered by any court.
"If I allowed this young man to die without granting him the benefit of every legal recourse available to him, my conscience would not let me escape the feeling that I had been a party to a lynching.
"For the reasons stated above and after prayerful consideration, I am granting the request for a temporary stay of execution and the appeal in this case."

[4] It is argued in the briefs for appellee that under § 43-2621 Ark. Stats. and the concluding part of § 43-2623 Ark. Stats. (both sections from the Criminal Code of 1869), neither this Court, nor any Judge thereof, has power to suspend the execution after the date has been set by the Governor. But such argument overlooks some of the provisions of Act No. 55 of 1913—as now found in § 43-2617 Ark. Stats.— which provision uses this language: ". . . a writ of error from the Supreme Court, or should the execution of the sentence be stayed by any competent judicial proceeding, notice of . . . such writ of error or stay of execution shall be served upon the superintendent of the penitentiary . . . and the said superintendent shall yield obedience to the same. . . ." The said Act of 1913 constituted legislative recognition of the inherent judicial power, so the § 43-2621 and § 43-2623 Ark. Stats. cannot have the strict meaning argued for them.

At the outset it must be pointed out that the Pulaski Circuit Court was not the correct tribunal to entertain jurisdiction of the present case: rather, a petition should have been filed in the Arkansas Supreme Court for permission to file a petition for writ of error *coram nobis*. In *State. v. Hudspeth,* 191 Ark. 963, 88 S. W. 2d 858, we held that where a judgment had been affirmed by this Court, the permission of the Supreme Court should be obtained before applying to the trial court for a writ of error *coram nobis,* saying:

"We think, however, that the better rule is that, when a judgment has been affirmed by this court, no application for the writ of error *coram nobis* may be made to the trial court without permission to make such application has been given by this court; and hereafter this rule will be enforced."

We have continued to adhere to the rule stated in the Hudspeth case. See *Black v. State,* 216 Ark. 805, 227 S. W. 2d 629; and *Jenkins v. State,* 223 Ark. 245, 265 S. W. 2d 512. The Pulaski Circuit Court should have dismissed the motion filed by Leggett on July 23rd.

Leggett's counsel now apparently recognizes the holdings in the cases just cited, because we are asked to treat the present case as a petition for permission to file a writ of error *coram nobis.*[5] In other words, we are asked to treat this case as though the appeal lodged in this Court on July 23, 1959 had been a request for permission to file a petition in the Circuit Court for a writ of error *coram nobis*; and we are asked to treat Justice JOHNSON's stay order as a temporary stay until this Court *en banc* could hear the petition on its merits. A discussion of the propriety of such treatment will gain nothing because we have concluded that, even if this proceeding had been a request for permission to file a

---

[5] *"Coram nobis"* means, literally, "before us ourselves"; whereas, *"coram vobis"* means "before you". "Writ of error *coram nobis*" is the legal way of saying, "Motion for new trial in a criminal case filed after the term of court has expired". "Writ of error *coram nobis*" early became a writ issued by the higher court (Court of King's Bench) to the trial court (court of *nisi prius*); and in that similarity, it is used in our jurisdiction today. See 18 C.J.S. p. 281.

petition for a writ of error *coram nobis,* nevertheless the stay order should not have been granted,[6] since the allegations made for Leggett presented no grounds for a writ of error *coram nobis.*

We have heretofore copied the allegations about newly discovered evidence, and that is the sole point urged in the present case. The Exhibit ''A'', referred to in the quotation heretofore, is a document of eighteen pages. It begins with a 2-page letter from the Menninger Foundation in Kansas to Honorable Orval E. Faubus, Governor of Arkansas. The letter is dated September 6, 1957, and attached to the letter is a report of sixteen pages, dated August 29, 1957, and being a report on the mental condition of Emmett Earl Leggett; and the conclusion of the report is that Leggett was insane at the time of murdering Joe King and at the time of the trial. This letter and document are referred to as the ''Menninger Report''; and thereafter the Governor set the date for the execution, as heretofore mentioned.

For a writ of error *coram nobis* to be granted by this Court on the basis of newly discovered evidence, it must be shown that the issue alleged to involve newly discovered evidence was an issue that was not presented at the original trial.[7] In *Jenkins* v. *State,* 223 Ark. 245, 265 S. W. 2d 512, two days before Jenkins was to be electrocuted, this Court was requested to grant permission for the filing in the trial court of a petition for writ of error *coram nobis,* and it was claimed that Jenkins was insane. We refused the request, saying:

''The question of appellant's insanity at the time of the killing was submitted to the jury in instructions

---

[6] We have other cases in this Court in which one Judge has made an order which was subsequently disapproved by the full Court. See *Carr* v. *State,* 93 Ark. 585, 122 S. W. 631; and *Levy* v. *Albright,* 204 Ark. 657, 163 S. W. 2d 529.

[7] In seeking a new trial for newly discovered evidence under § 43-2203 Ark. Stats. it is essential that the alleged newly discovered evidence be more than merely cumulative. *Ary* v. *State,* 104 Ark. 212, 148 S. W. 1032; *Hawthorne* v. *State,* 135 Ark. 247, 204 S. W. 841.

given on the court's own motion and other instructions requested by both the State and appellant."[8]

In the case at bar, we have examined the transcript in the first case — the one in which Leggett was tried for the murder of Joe King, convicted, and sentenced to death. The record contains 856 pages, and shows that Leggett was represented by able and experienced counsel; and Leggett's alleged insanity was one of the main defenses. We refer to the following matters appearing on the numbered pages in the transcript in the first case:

(a) The Trial Court ordered the defendant committed to the State Hospital for examination as to sanity, in accordance with Initiated Act No. 3 (Tr. p. 5); and the hospital report was filed (Tr. p. 612);

(b) The defendant's counsel asked and obtained access to all files in the office of the State Hospital (Tr. p. 8);

(c) Defendant's counsel called Dr. Thomas H. Hickey, who testified as to Leggett's alleged insanity (Tr. p. 718-739);

(d) Defendant's witness, Dr. Elizabeth Fletcher, also testified as to Leggett's mental condition (Tr. p. 756-799);

(e) The defense called Dr. Goss of the State Hospital to testify (Tr. p. 607-647);

(f) The defense also called Dr. Crawfish (Tr. p. 647-658);

(g) The defense called Dr. McKelvey on the matter of Leggett's mental condition (Tr. p. 658-665).

The defendant requested, and the Court gave, three instructions all on the matter of insanity, these being Defendant's Instruction No. 6 (Tr. p. 835), Defendant's Instruction No. 7 (Tr. p. 837), and Defendant's Instruction No. 8 (Tr. 837).

---

[8] The case of *Black* v. *State*, 216 Ark. 805, 227 S. W. 2d 629, was similar in many respects to the Jenkins case.

Thus, it is crystal clear: (1) that in the first case (being the one of Leggett's trial and conviction for the murder of Joe King) Leggett's mental condition at the time of the homicide was fully explored; and (2) that the "Menninger Report" is only cumulative of the testimony of some of the doctors who testified in Leggett's behalf in the first case. Since cumulative evidence is not sufficient grounds for the granting of a new trial, it is certainly not sufficient to authorize this Court to grant permission to file a petition for writ of error *coram nobis*. So, even if we treat the present proceeding as having been a petition for writ of error *coram nobis* filed in this Court on July 23, 1959, we reach the conclusion that the petition is without merit, and that the stay order should not have been issued.

The stay order is now revoked, and the Clerk of this Court will issue a certificate, under § 43-2724 Ark. Stats., so that the Governor of Arkansas may proceed under § 43-2623 Ark. Stats. and exercise the power delegated to him by law to fix the date for the electrocution of Emmett Earl Leggett.

SMITH, JOHNSON and ROBINSON, JJ., concur.

JIM JOHNSON, Associate Justice, concurring. After prayerful consideration of this entire case on its merits, and after untold hours reviewing the law, I concur with the result reached by the majority. This conclusion is based upon the law and facts in the case and not upon the reasoning set forth in the majority opinion.

The Attorney General argues that neither this Court nor any Judge thereof has the power to suspend an execution after the date has been set by the Governor. The majority opinion in a footnote properly refutes this argument in the following language:

"But such argument overlooks some of the provisions of Act No. 55 of 1913 — as now found in § 43-2617 Ark. Stats. — which provision uses this language: '. . . a writ of error from the Supreme Court, or should the execution of the sentence be stayed by any competent judicial proceeding, notice of . . . such

writ of error or stay of execution shall be served upon the superintendent of the penitentiary . . . and the said superintendent shall yield obedience to the same . . .' The said Act of 1913 constituted legislative recognition of the inherent judicial power, so the § 43-2621 and § 43-2623 Ark. Stats. cannot have the strict meaning argued for them.''

thereby conceding that I, as a member of this Court, had authority to grant the stay of execution until the full Court could consider the case upon its merits.

This authority was not granted to this Court or a member thereof by the Acts cited by the majority. The Supreme Court of this state is a court created by the Constitution and as such it possesses the inherent power to do all acts necessary to enable it to effectually exercise the jurisdiction conferred upon it. The authority to review and revise necessarily includes the power to enforce the law and administer justice. Independent of any statutory provision, this Court has the power to so frame its judgments and orders as to secure justice to litigants within its jurisdiction since the right of appeal carries with it a right to a judgment awarding justice according to law. The judiciary is an independent department of state government. It derives none of its judicial power from either of the other departments. It is true the General Assembly may create courts under the Constitution but it cannot confer on them judicial power for it possesses none to confer. Therefore, it must be concluded that a member of this Court has the *inherent* judicial power to stay executions.

Conceding that I, as a member of this Court, had the authority to issue the stay of execution, the question becomes, was it proper for me to use that authority. The majority opinion says: ''The stay order should not have been granted''. In so holding, the majority came to this conclusion after more than 80 days of deliberation and consumed 10 pages in so stating. It must be remembered that I had less than two hours to consider this matter of such grave importance involving an

issue of life or death. It would have been presumptuous of me to have assumed the grave responsibility of denying the petition without allowing the other members of the Court to review the same. As can be readily seen, in that short span of less than two hours it would have been impossible for me to have reviewed the authorities and the facts in this case and reached an intelligent conclusion. Particularly is this true in view of the concession by the majority that the first Leggett case alone contains 856 pages. Given the opportunity and time which the majority has had, and which I have now had, no doubt I would have reached the same conclusion that I have now reached. This petitioner was to have been executed within a matter of hours from the time the petition was presented to me. I chose then that if I should make a mistake it would be made in favor of life rather than death. Five members of this Court on the day following the issuance of the stay in this case met to review the action taken by me. After oral argument by the Attorney General and the attorney for petitioner, the majority present refused to disturb the stay until the case could be briefed and heard. Let us assume that after investigation the petitioner was proven to be right and I had denied the relief sought. The result would have been the execution of the appellant and an investigation of his case afterwards. I shudder to think of the consequences that I and each member of this Court would have suffered. The most that we could have done then would have been to have reversed the judgment and to that extent vindicate the memory of the deceased. This is not the justice contemplated by the law. I said then: ''If I allowed this young man to die without granting him the benefit of every legal recourse available to him, my conscience would not let me escape the feeling that I had been a party to a lynching.'' I gave the appellant the benefit of every legal recourse available to him that was within my power to give. His petition has now been prayerfully considered by the full Court on its merits and found to fall short of the requirements of the law. My conscience is clear. Therefore, in

respectfully concurring with the majority opinion in the results reached, nothing is said in the reasoning of the majority opinion that would ever cause me in the future under the same or similar circumstances to deny to any person, white or black, the same relief granted petitioner herein.

For the reasons stated above, I respectfully concur.