John Edward SWINDLER *v.* STATE of Arkansas

CR 77-189                          569 S.W. 2d 120

Opinion delivered July 17, 1978
(In Banc)
[Rehearing denied September 5, 1979.]

108

110

*Don Langston,* for appellant.

*Bill Clinton,* Atty. Gen., by: *Garner L. Taylor, Jr.,* Asst. Atty. Gen., for appellee.

CONLEY BYRD, Justice. Appellant killed Officer Randy Basnett of the Fort Smith Police Department at the Road Runner service station on Kelly Highway which is located just off Interstate 540 and across from the State Police District Headquarters in Fort Smith. The jury found appellant guilty of Capital Felony Murder and fixed his punishment at death. For reversal appellant raises the issues hereinafter discussed.

POINT I. Before trial appellant properly moved for a change of venue with the necessary supporting affidavits. The proof showed, without contradiction, that the news media had saturated the public with the fact that appellant had been released from Leavenworth prison just a week before killing Officer Basnett and that at the time of the killing he was wanted in South Carolina for the recent murder of two teenagers. The fact that appellant had been interviewed by the South Carolina authorities was also given widespread publicity. In addition to the publicity involving the killing and subsequent funeral of Officer Basnett, the Concerned Policemen's Wives Organization, some 45 strong, circulated petitions requesting two policemen to each patrol car. This organization wearing black arm bands collected between nine and ten thousand signatures. The people who signed the petition mentioned the policeman that was killed by appellant, and were told that the black arm band was worn in mourning and in respect of the fallen officer.

Alan Wooten, an attorney and resident of Fort Smith, testified that he did not think it possible from the one thou-

sand or so people selected by the jury commissioners to select twelve people who either do not have a fixed opinion or could set aside the opinion they have as to the guilt or innocence and hear this case and base their decision solely on the law and evidence as presented in court.

Tom Anderson, the Historical Director for Sebastian County, testified that from his conversations with other people, they felt the same way he did. Every one of them seemed to think appellant was guilty. At least ten of the people he talked to said that appellant didn't even deserve a trial at all. Several of them said appellant should have been shot and thrown in the river when they captured him. On cross-examination he testified that to him a fair trial means that the jury will make their decision based on what they hear inside the courtroom and would either be ignorant or would blot out everything they've heard before they got to court. He hadn't run into anybody that would fit that criteria in Sebastian County.

Robert Taylor, an attorney and resident of Sebastian County, testified that appellant could not get a fair trial in Sebastian County. He stated that any person he talked with had the distinct opinion that appellant was guilty. When he told a friend that he was going to go to court to testify, the friend became highly irate that he planned on showing up and told him that they ought to shoot appellant first and try him later.

Bill Hayes, manager for Southwestern Bell Telephone Company, a resident of Sebastian County, testified on direct that he felt like appellant could get a fair trial. On cross-examination he admitted that from the news media he got the information relative to appellant's background — *i.e.*, he was just recently released from Leavenworth Penitentiary and that he was wanted in South Carolina for two murders. He then testified that in his conversations with 75 or 100 people, there were some that did say what they thought ought to happen to appellant. Some felt like he ought to be executed. He heard enough comment that the people he conversed with were surprised that appellant was brought in alive.

Jack Ragains testified on direct that in his opinion appellant could receive a fair trial. On cross-examination he stated that he had heard from the news reports that appellant had been in the penitentiary. He had heard about appellant being wanted in South Carolina for two murders. From what he heard and read in the case everything indicated that appellant had committed the crime. He would rather see appellant tried where he committed the crime. People he had discussed it with had expressed the opinion that appellant was guilty. None of his customers had a different opinion.

Ron Strumbaugh, a State Farm Insurance Agent, testified on direct that he thought appellant could receive a fair trial in Sebastian County. On cross-examination Mr. Strumbaugh admitted that from the news media he was familiar with appellant's background and stated that he thought the defense in appellant's case was unpopular.

In all the trial court heard six witnesses on behalf of appellant testify that appellant could not get a fair trial and 24 witnesses for the State who stated on direct examination that appellant could get a fair trial. On cross-examination each witness for the State testified much like Bill Hayes, Jack Ragains and Ron Strumbaugh. At the end of the testimony the trial court denied the motion for a change of venue. Following the selection of the jury and the two alternates, appellant again raised his motion for a change of venue and again it was denied.

The record shows that in the voir dire of the jury 62 prospective jurors were questioned. Twenty-three jurors were excused for cause. Appellant exhausted his twelve peremptory challenges and moved to excuse for cause eleven of the twelve jurors selected. In selecting the two alternates appellant exercised his one peremptory challenge and the trial court excused eight for cause. Every juror selected to try appellant except G. C. Whitfield knew appellant's background from the news media. Juror Phyllis Russell stated that from the media she knew that appellant had been in prison. She also remembered that appellant was wanted for questioning. She had the opinion that appellant did it. She couldn't say whether or not these things she had heard

would have any effect on her verdict. She didn't think she could say that it would not have any effect.

Typical of the jurors excused for cause is Mrs. Clarence Anderson who stated "I have my mind made up and I don't believe I can change my opinion." Another example is Herman Yandell who stated that he had heard other people say that the officers caught appellant right in the act and that they didn't see how appellant could be anything other than guilty. He concluded that those conversations would color his verdict. Along this same vein is the testimony of Mary Ellen Jesson (excused by the State) that perhaps some of this information she had obtained before coming to court would influence her in some way if she were selected as a juror.

Among the jurors peremptorily challenged by appellant were Hubert Davis and Wanda Foster. Hubert Davis had worked for the same company with the father of Officer Basnett for 17 years. Since Officer Basnett's death, he had told his father he was sorry to hear it. Wanda Foster had worked at the United States Marshall's Office for the last eight and one-half years. Robert Taake stated that he could not be one hundred percent sure that he would not let the news media information affect his verdict.

We agree with the State that the trial court has wide discretion in deciding whether to grant a change of venue and that unless the trial court abuses its discretion, the trial court's order is conclusive on appeal. We also agree with the State that the burden of proof is upon the defendant moving for a change of venue to make credible proof to support his motion. However, when we view the record before us as it appeared when appellant renewed his motion for a change of venue after the jury was selected, we must hold that the trial court abused its discretion in denying the motion for a change of venue. The voir dire of the jury corroborates the testimony of Alan Wooten, Tom Anderson and Robert Taylor that it would be very difficult to find twelve people who could put all of the news media information aside.

POINT II. We also agree with appellant that the trial court, under the circumstances, erred in holding that Hubert

Davis, Wanda Foster and Robert Taake were qualified to serve as jurors. In an emotionally packed trial involving the killing of an officer by an ex-convict where the only real issue is a sentence of life or a sentence of death, it can hardly be said that a 17 year co-worker of the father of the slain policeman, who has taken the time to give his condolence to the father, is an unbiased juror. Neither should an employee of a law enforcement agency be considered a competent juror where the killing results from an assault upon an officer of the law while acting in the scope of his employment. Robert Taake did not qualify as an impartial juror, *Glover v. State*, 248 Ark. 1260, 455 S.W. 2d 670 (1970).

We agree with the State that the question of a juror's qualification rests within the sound discretion of the trial court and that the proper test is whether the prospective juror can lay aside his impression or opinion and render a verdict based upon the evidence presented in court. However, where the juror testifies that he is not one hundred percent sure that he can lay aside his previous impressions or opinions, we do not see how any discretion on the part of the court can add any assurance that the verdict will be rendered only upon the evidence presented in court.

POINT III. The evidence showed that at the time of the shooting appellant had in his possession guns and ammunition other than the snub nosed .38 caliber he used to shoot Officer Basnett. Appellant objected to the introduction of these items on the basis that they had no relevant connection with the offense. We agree with the State that under the circumstances the big cache of guns by one just shortly out of Leavenworth prison and wanted for two murders in South Carolina would tend to show that there had been some premeditation and deliberation about how he should act in the event he was approached by a policeman. After all, one does not ordinarily walk around in a civilized society loaded and ready to shoot for bear.

POINT IV. State's Exhibit No. 47, reflecting that appellant was on parole from Leavenworth prison was introduced as an aggravating circumstance pursuant to Ark. Stat. Ann. § 41-1303 (Repl. 1977), which provides:

> "Aggravating circumstances shall be limited to the following:
>
> (1) the capital murder was committed by a person subject to imprisonment, suspension, on probation as a result of being found guilty of a felony."

Appellant contends that when we strictly construe Ark. Stat. Ann. § 41-1303, *supra,* the trial court erred in admitting State's Exhibit No. 47. Since the purpose of both probation and parole is to give conditional freedom to one convicted of a felony, we find no merit in appellant's contention that his parole on his felony conviction did not amount to an aggravating circumstance within the meaning of Ark. Stat. Ann. § 41-1303, *supra.*

POINT V. Ark. Stat. Ann. § 41-1303 (Repl. 1977), provides:

> "Aggravating circumstances shall be limited to the following:
>
> . . .
>
> (4) the capital murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody."

State's Exhibit No. 49, being a complaint and warrant for appellant's unlawful flight to avoid prosecution, was admissible to show that Officer Basnett, who was checking on the registration of appellant's stolen automobile at the time of the shooting, was shot for the purpose of avoiding or preventing a lawful arrest.

POINT VI. As we read the record, appellant's automobile was headed east which would place his automobile with the door on the driver's side next to the station in which Carl Tinder and another customer were located at the time appellant started firing at Officer Basnett through the door on the driver's side of his car. Since this would place the people inside the station within the line of fire and only 23

feet from appellant's gun, we cannot say that the trial court erred in submitting to the jury the issue of whether appellant created a great risk of death to a person other than the victim.

POINT VII. During the closing argument on the penalty, after the jury had found appellant guilty of capital felony murder, appellant wanted to argue to the jury that the killing of Officer Basnett was a status killing and that the death penalty would not be involved if Basnett had been just an ordinary person. The trial court required appellant to qualify his statement by saying that his premise would be correct "in some circumstances" — *i.e.* the trial court told appellant that he could not misquote the law. Appellant now contends that the trial court unduly restricted his argument and that the conversation with the trial court gave the jury an impression of what the trial judge felt of counsel's argument. The conversation is not likely to arise on a new trial. On the other issue, the trial court has a wide latitude of discretion in controlling the extent, scope, range and propriety of arguments to the jury and we cannot say that he abused his discretion in not permitting appellant to misquote the law.

POINT VIII. Appellant made a great ploy to the Governor to stay appellant's execution on tha basis that without the Governor's intervention appellant would have been executed before he could exercise his right of appeal because of the necessary delay in obtaining the transcribed testimony. Appellant overlooked the fact that he could have filed with this court a partial record, consisting of only the judgment entered by the trial court, and have obtained a stay from this court, *Leggett v. State*, 231 Ark. 13, 328 S.W. 2d 252 (1959).

Other contentions raised by appellant with reference to the constitutionality of the Arkansas Death Penalty Statute are without merit, *Collins v. State*, 261 Ark. 195, 548 S.W. 2d 106 (1977).

Finally appellant contends that when we compare this case with others, we should reduce his sentence to life without parole. We find no merit to this contention. Appellant's assertion that "this was a gun battle type situation without a thought of the consequences because of the instinct way the

incident occurred" is not supported by the record. Steve Cardwell, an eye witness, testified that appellant shot Officer Basnett twice before the officer drew his gun.

POINT IX. Appellant's contention that the trial court should have relieved the public defender and appointed him private counsel has no basis in fact and we consider it without merit.

Appellant's motion to disqualify the trial judge had no merit, *Walker* v. *State,* 241 Ark. 300, 408 S.W. 2d 905 (1966). Furthermore, in view of our holding that the trial court should have granted the motion for a change of venue, the issue is not likely to arise on new trial.

Appellant contends that the capital felony murder statute is invalid because the killing of an ordinary citizen under the same circumstances in which a policeman is killed is only first degree murder — *i.e.* life imprisonment at most. We find no merit to this contention, *Finley* v. *California,* 222 U.S. 28, 321 S. Ct. 13, 56 L. Ed. 75 (1911). A policeman is society's bulwark or badge of security and the killing of a policeman while performing his duties is an attack upon society's security as a whole as compared to an attack upon an individual or the members of his family in the case of an individual. Furthermore, a policeman by the very nature of his duties is required to take risks that an ordinary citizen is not obligated to participate in. There is also the pragmatic consideration that unless courts can be expected to administer justice according to law, then the officers, who must pursue and capture one such as appellant, may have a greater temptation to solve the matter before it gets to court or at least the legislature had the right to consider such matters in making the classification.

Since appellant is unable to show any prejudice resulting from any allegedly suppressed evidence, we fail to see how he is in a position to contend that the trial court erred in failing to suppress any evidence. Appellant has abstracted no evidence that was allegedly obtained illegally and used against him.

The evidence of eye witnesses shows that Officer Basnett in response to an FBI bulletin had reason to check the registration of the automobile appellant was driving. Appellant under the pretense of getting the registration out of the car pocket, sat down in the front seat of the car and shot Officer Basnett with a .38 caliber snub nosed pistol before Officer Basnett had pulled a gun. This evidence when stated most favorably to the State, as we must do on a motion for directed verdict, was ample to sustain the jury's verdict.

Appellant complains of the trial court's amendment of his self-defense instructions to incorporate the provision of Ark. Stat. Ann. § 41-507 (Repl. 1977), to the effect that a person may not use deadly physical force in self-defense if he knows that he can avoid the necessity of using that force with complete safety. We can find no merit to this contention.

The trial court in accordance with long practice told the jury that "The premeditation and deliberation defined in these instructions may be inferred from the circumstances of the case." Appellant contends that this instruction amounts to a comment on the evidence because it instructs the jury on facts it can presume. This principle of law has been stated many times, with approval, *Hamilton* v. *State*, 262 Ark. 366, 556 S.W. 2d 884 (1977), and we fail to see how appellant's claimed self-defense makes it a comment on the evidence.

POINT X. Appellant made a number of contentions that are not likely to arise on a new trial such as the appointment of an investigator, and the expense to conduct a poll to show that he could not get a fair trial in Sebastian County and to suppress his incriminating statements.

Rule 18.3 of the Rules of Criminal Procedure permits the trial court to be informed before trial of the nature of any defense which defense counsel intends to use at trial and also the names of witnesses. Such information makes it possible for the parties to have before the court all witnesses, including rebuttal witnesses, that may be called to testify. This information prevents the necessity of giving continuances to get key rebuttal witnesses and on the record before us, we cannot see how appellant has been prejudiced or that any of his constitutional rights have been violated.

Reversed and remanded for new trial.

HARRIS, C.J., and HOWARD, J., concur.

FOGLEMAN, J., concurs in part and dissents in part.

CARLETON HARRIS, Chief Justice, concurring. I am distressed today that it is necessary that this case be reversed because a change of venue was not granted. I will have to say, after reading this record very carefully, that I am forced to conclude that the reversal is warranted.

From the outset, this homicide received tremendous publicity, as would be expected. The newspaper gave front page headlines, and television and radio likewise gave extensive publicity. It would have been almost impossible for people who read or listened to the reports not to have formed an opinion. Of course, the news media were entitled to give full reports of the slaying and of the arrest, and were entirely in order in using the pictures and stories appearing relative to the funeral, which were, after all, a tribute to a young officer performing his duties. But events included in some of the articles really had nothing to do with the slaying itself, and certainly could have been highly prejudicial. I refer to the fact that it was frequently mentioned that Swindler had allegedly committed two brutal murders of teenagers in South Carolina, and that South Carolina officers had come to Fort Smith. The fact that Swindler had a prison record was several times mentioned. In addition, stories pointed out that there were several guns in Swindler's car and that the car was stolen. Television and radio stations gave extensive coverage and personnel of those stations testified as to their "coverage;" for instance, KFPW television has a coverage of about 28,000 homes at 5:00 p.m. and 24,000 homes at 10:00 p.m.; radio station KWHN has AM and FM circulation of 59,000 to 60,000 persons and, all in all, the entire county was "saturated" with news concerning the killing, the stories embracing several weeks. Also, a detective magazine, "Inside Detective," distributed by S&S News Agency, Inc., and sold by Butterfield Trail newsstand in Fort Smith, carried a story entitled "God Help the Cop Who Stops This Guy." An article with pictures appears relative to the defendant's case.

KISR radio station broadcast ads seven times a day for five days advertising this story.

Thirty people testified relative to whether Swindler could obtain a fair trial in that county (six stating that he could not obtain a fair trial and 24 stating that he could obtain a fair trial.). However, of that last 24, 23 were familiar with the South Carolina charges and 20 were familiar with the fact that Swindler had served time. While most of these people testified that they thought he could obtain a fair trial, it was noticeable that the people they talked with who expressed an opinion considered Swindler guilty; in fact, no one expressed the thought that he might be innocent.

More importantly, of 49 people[1] examined during selection of the jury, 26 stated that from what they had read and heard, Swindler "did it;" 32 were familiar with the South Carolina charges and 21 were aware of his prison record. Some of these people were excused by the court for cause.

With some others, it was necessary that the defense use a peremptory challenge (all of which were exhausted), and when the jury was finally selected, it included four persons who had stated that from what they had heard they thought the man was guilty. Now, of course, each stated that he could set this opinion aside on the basis of the evidence heard and reach a verdict based entirely on the evidence.[1a] While this was the general statement made on direct examination, the prospective jurors answered in a slightly different manner when cross-examined. One juror on the panel had heard about the people killed in South Carolina, and he stated that

---

[1]This does not include the 13 or 14 examined as alternate jurors, since the alternates did not serve.

[1a] One juror stated that she believed "he did do it," and that she still had that opinion. When asked if the opinion would affect her verdict, she answered, "I couldn't say. I would hope that I would be able to listen to what was brought in with an open mind and take it from there." Still, however, she was unwilling to say "at this particular moment" that her prior feelings would have no effect. The court stated, "I believe when I first questioned Mrs. _____ you said you would hope that you would be able to set aside your opinion and just base your verdict on the evidence of the law. Does that still hold true, that statement?" She answered, "Yes, sir. I hope that I could be that type of person and be able to do that." Thereupon, the court refused to grant the motion to excuse her for cause.

based on what he had read and heard, his presumption was that the defendant actually shot the officer; that his opinion "right now" is that he did it. He said before he knew he was going to be on the jury panel, he discussed the case with other people and that it was everybody's opinion that he was guilty, and that was his opinion, too. A motion that he be excused for cause was denied and the defendant was forced to exercise a peremptory challenge. Another person, who served as a juror, stated that she "might" have an opinion which she got from the media, but not one that could not be changed, depending on the facts presented in evidence. She was aware that he was supposed to have murdered two people, had heard a lot of talk about the case to be tried, felt that he "probably did it," considering all that was done and had been said. When asked if she would be able to set aside what she had heard about him being in prison and having been suspected of other crimes, the prospective juror answered, "No. It is bound to have some effect, I should think." A motion to excuse for cause was denied, and this person served on the jury. Another lady who served on the jury stated that she had discussed the case with other people and that they thought it was a foregone conclusion that Swindler killed the officer. She said these people accepted the facts as they were related in the paper and on television and that she probably came up with a foregone conclusion, too. The defendant's motion to excuse for cause was overruled and this lady served on the jury.

I will just say that I served for a number of years in the prosecuting attorney's office and am now in my 22nd year on this court, and the prospective jurors knew more purported facts about the defendant's background, and based on what had been heard in the news media, more had formed at least tentative opinions as to guilt, than any case I have ever come into contact with.

Of course, what we are confronted with is the age-old problem of trying to work out a balance between the First (free speech) and Sixth (fair trial) Amendments.

I recognize, and the courts have recognized for years, that it would be almost impossible today to draw a jury in-

volving any prominent case where the prospective jurors would be entirely unfamiliar with any alleged facts or issues and that is the reason for the ancient rule, "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." In general, this has been sufficient to qualify a juror to serve. This was commented upon in *Irvin* v. *Dowd,* 366 U.S. 717. In that case, six murders were committed in the vicinity of Evansville, Indiana. The defendant was arrested and shortly thereafter, police officers issued press releases widely publicized, stating that the defendant had confessed to the six murders. At his request, he was granted a change of venue to the adjoining county, but further change of venue because of inflammatory publicity was denied. Irvin was convicted, and after the confiction was affirmed by the Indiana Supreme Court, Irvin instituted a *habeas corpus* proceeding to the United States Supreme Court. The opinion, in giving some of the facts, states:

> "A reading of the 46 exhibits which petitioner attached to his motion indicates that a barrage of newspaper headlines, articles, cartoons and pictures was unleashed against him during the six or seven months preceding his trial. The motion further alleged that the newspapers in which the stories appeared were delivered regularly to approximately 95% of the dwellings in Gibson County and that, in addition, the Evansville radio and TV stations, which likewise blanketed that county, also carried extensive newscasts covering the same incidents. These stories revealed the details of his background, including a reference to crimes committed when a juvenile, his convictions for arson almost 20 years previously, for burglary and by a court-martial on AWOL charges during the war. He was accused of being a parole violator. The headlines announced his police line-up identification, that he faced a lie detector test, had been placed at the scene of the crime and that the six murders were solved but petitioner refused to confess. Finally, they announced his confession to the six murders and the fact of his indictment for four of them in Indiana. They reported petitioner's offer to plead guilty if promised a 99-year

sentence, but also the determination, on the other hand, of the prosecutor to secure the death penalty, and that petitioner had confessed to 24 burglaries (the modus operandi of these robberies was compared to that of the murders and the similarity noted)."

Many of the stories identified the defendant as a parole violator and fraudulent-check artist, and shortly before the trial, carried stories that he had already admitted murders of several other people. The court then quoted the ancient rule (earlier quoted here), but made it clear that a juror exposed to prejudicial publicity is not proven impartial by his mere declaration that he will not allow such evidence to influence him. The court stated:

> "Here the 'pattern of deep and bitter prejudice' shown to be present throughout the community, cf. *Stroble* v. *California*, 343 US 181, 96 L. Ed. 872, 72 S. Ct. 599, was clearly reflected in the sum total of the *voir dire* examination of a majority of the jurors finally placed in the jury box. Eight out of the 12 thought petitioner was guilty. With such an opinion permeating their minds, it would be difficult to say that each could exclude this preconception of guilt from his deliberations. The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental processes of the average man."

I am not nearly so much concerned about publicity that arises after the trial has commenced. For one thing, the news releases are, in the main, based on what the witnesses actually said, i.e., hearsay or incompetent evidence is not a part of such a news story. Then, too, after all, the objective is to protect the jury from becoming aware of outside reports, and if necessary, a jury can be sequestered. But I am disturbed about newspaper stories and television releases that occur at the time, or soon after, the crime occurs, and for days and weeks thereafter, I suppose mainly because there are so few answers (if indeed there are adequate answers) to the problem. Let me make it very clear that I do not favor any "gag" rule and prior restraint is invalid — but though it were otherwise — I still would not favor it since I strongly support

a free and unfettered press. Accordingly, I really only know of three things that, at least, constitute a partial answer. First, where publicity, including matters which could well be prejudicial to a fair trial for a defendant, runs rampant throughout the community, a change of venue would have to be granted. This is only partially satisfactory for the reason that our constitution provides that if a change of venue is granted, it shall be to some other county in the same judicial district. Article 2 § 10 Arkansas Constitution. It is hardly necessary to say that, while feelings may not be as strong in an adjoining county, still, the inhabitants of that county are fairly well acquainted with the news stories and the television and radio reports. Certainly, there would be much less prejudice several counties away from the county in which the crime was committed — but that is not possible under our constitutional provision.[2] Of course, Sebastian County is a circuit within itself, and in such event, this case would be transferred to an adjoining county. See *Cockrell* v. *Dobbs, Judge,* 238 Ark. 348, 381 S.W. 2d 756.

Time is the greatest healer for grief or unpleasant occurrences, and it may be that cases of the nature here under discussion should not be set for trial until a sufficient "cooling off period" has elapsed. What amount of time this would involve, I cannot say; of course, it might well be necessary that a defendant move for the continuances to prevent a possible later claim that he had not received a speedy trial. Since the delay would be for his benefit, I cannot see why a defendant would object to taking such a step.

A third possibility is voluntary action on the part of the news media, and after all, a great deal of restraint would not be required. As earlier stated, certainly the media has the right, even the duty, to report crime, and is privileged to give the necessary details of the particular offense; if the suspected perpetrator has not been apprehended, any information necessary to aid in his apprehension or to warn the public of

---

[2]Of course, this solution would likewise pose problems since it would be necessary that witnesses, probably most of whom live in the county where the crime occurred, and officials would have to travel to the new county where the trial was to be held, necessitating great expense and inconvenience.

any dangers he might present, would also be very much in order.

Perhaps I can briefly summarize information that may well prove prejudicial. The things that I will mention are included in the American Bar Association Standards relating to fair trial and free press, although those standards are much more comprehensive, and I understand under revision at the present time. I do not necessarily agree with all these standards, and I shall only mention those that I consider go to the "heart of the matter" and only insofar as they relate to the selection of an unbiased and unprejudiced jury. I agree that the following categories of information are prejudicial to a fair trial[3] and they have been so declared in various court opinions.

> "The prior criminal record (including arrests, indictments, or other charges of a crime),[4] or the character or reputation of the defendant;
>
> The existence or contents of any confession,[5] admission, or statement given by the defendant, or the refusal or failure of the defendant to make any statement;
>
> The performance of any examinations or tests or the defendant's refusal or failure to submit to an examination or test;
>
> The possibility of a plea of guilty to the offense charged or a lesser offense;
>
> The defendant's guilt or innocence or other matters relating to the merits of the case or the evidence in the case . . . . "

---

[3]This summary of categories is taken from (although I have only used a small part) "Courts and the News Media" published by the National College of The State Judiciary, University of Nevada.

[4]For instance, in the present case, I think undoubtedly one of the most prejudicial items conveyed to the public was the fact that this defendant was accused of a heinous double murder in South Carolina, and as herein pointed out, a great majority of the jury panel was familiar with this fact.

[5]No confession was involved in the instant case.

Actually, if only the first two mentioned were omitted from news stories and broadcasts, I feel that a change of venue in many a case would be avoided.

I understand (I use this word because I was not a participant) that a few years ago, a committee composed of attorneys and members of the news media had a number of meetings relative to the American Bar Standards, but never did reach any satisfactory conclusions. Sometime thereafter, a committee representing the Arkansas Bar Association filed a petition with this court, seeking the adoption of five rules to existing rules of criminal procedure, which would have established guidelines covering the release and publication of information in connection with criminal proceedings. The Arkansas Press Association, a leading journalism society (Sigma Delta Chi) and a number of individual newspaper reporters were opposed to the proposed rules. This court unanimously entered an opinion on May 1, 1972, denying the petition. See 252 Ark. 418, 479 S.W. 2d 533. We expressed doubt about the constitutionality of some of the proposed provisions and further stated that we were not convinced that we had a problem with court news dissemination that required the adoption of rather rigid rules covering all phases of the subject.[6] I am still of the same view, but certainly wish that something could be done relative to the question of pre-trial publicity that would prevent, or at least minimize, the probability of disqualification of prospective jurors. I really think that a committee composed of judges, lawyers, law enforcement officers, and officials of the media, newspapers, television stations, and radio stations, could review the matter under discussion and come out with a helpful solution (not necessarily the recommendations of the ABA) — perhaps not perfect — but certainly a progressive step in meeting this problem.

I may be well wasting my time in writing this concurrence, but this problem I can foresee as happening again and again. Having to retry a case takes time — it takes money — and a final conclusion is wearisomely protracted. This is

---

[6]The proposed rules mainly dealt with restrictions on court officials, or events occurring in the courtroom.

neither fair to the public, nor to a defendant, and any efforts that can be made to remedy the situation are worth a try.

I am persuaded that all mentioned, jurists, lawyers, law enforcement officers, members of the news media, and, of course, the citizens of our state, are interested in achieving justice as rapidly and efficiently as possible, and I would hope that suggestions could be offered that would be workable and satisfactory to all concerned.

GEORGE HOWARD, JR., Justice, concurring. The United States Supreme Court in reversing the death sentence imposed in the case of *Witherspoon v. Illinois*, 391 U.S. 510, made the following observation:

> "... [A] State may not entrust the determination of whether a man is innocent or guilty to a tribunal 'organized to convict.' . . . It requires but a short step from that principle to hold, as we do today, that a State may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death. Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected.
>
> "Whatever else might be said of capital punishment, it is at least clear that its imposition by a hanging jury cannot be squared with the Constitution. The State of Illinois has stacked the deck against the petitioner. To execute this death sentence would deprive him of his life without due process of law."

In *Witherspoon*, thirty-nine veniremen, including four of the six who indicated that they did not believe in capital punishment, had acknowledged having conscientious or religious scruples against the infliction of the death penalty or against its infliction in a proper case and were excluded

without any effort being made to find out whether their scruples would invariably compel them to vote against capital punishment.

One venireman who admitted to a religious scruple against the death penalty when asked: "You don't believe in the death penalty?" She replied: "No." But later she stated she had no religious scruples against capital punishment and further stated that she would not "like to be responsible for . . . deciding somebody should be put to death." She was excused.

In *Maxwell* v. *Bishop, Penitentiary Superintendent*, 398 U.S. 262, the United States Supreme Court, in reversing this Court's affirmance of Maxwell's death sentence,[1] stated:

"As was made clear in *Witherspoon*, 'a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.' . . . As we there observed, it cannot be supposed that once such people take their oaths as jurors they will be unable 'to follow conscientiously the instructions of a trial judge and to consider fairly the imposition of the death sentence in a particular case.' . . . 'Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position.' . . . *See also: Boulden* v. *Holman*, 394 U.S. 478, 89 S.Ct. 1138 (1969).

In *Maxwell*, one prospective juror was successfully challenged for cause solely on the basis of the following exchange:

"Q. If you were convinced beyond a reasonable doubt at the end of this trial that the defendant was guilty and that his actions had been so shocking that they would merit the death penalty do you have any con-

---

[1]*See: Maxwell* v. *State*, 236 Ark. 694, 370 S.W. 2d 113.

scientious scruples about capital punishment that might prevent you from returning such a verdict?

"A. I *think* I do." (Emphasis supplied)

Still another member of the panel was dismissed after the following dialogue:

"Q. Mr. Adams, do you have any feeling concerning capital punishment that would prevent you *or make you have any feelings about* returning a death sentence if you felt beyond a reasonable doubt that the defendant was guilty and that his crime was so bad as to merit the death sentence?

"A. No, I don't believe in capital punishment." (Emphasis supplied)

In the instant case, veniremen were excused from serving on appellant's jury for reasons essentially similar to the ones quoted above in *Maxwell*. For example, one prospective juror was asked:

"Q. Would you vote to impose the death penalty if that were called for under the law of Arkansas?

"A. I *doubt* it." (Emphasis added)

The prospective juror further testified:

"Q. It wouldn't matter how bad the fact situation was, you would vote against the death penalty?

"A. Yes. I *believe* I have verified that." (Emphasis supplied)

Another prospective juror was excused following this exchange:

"Q. In other words, you would vote against it? You know right now no matter what the fact situation develops here, you know right now you would vote against the death penalty?

"A. I *believe* so." (Emphasis added)

Another prospective juror testified as follows:

"Q. . . . [C]ould you and would you vote for the death penalty?

"A. I don't *think* so." (Emphasis added)

There were other instances where prospective jurors were excused when they voiced general and ambiguous objections to imposing the death sentence. In my judgment, the trial court committed reversible error in excusing those prospective jurors who were not unequivocally committed to the death sentence. In substance, appellant's jury in the words of the Supreme Court in *Witherspoon*, was stacked against the appellant and this cannot be squared with the Sixth and Fourteenth Amendments to the Constitution of the United States.

In the recent case of *Davis* v. *Georgia*, 429 U.S. 122, 97 S. Ct. 399 (1976), the United States Supreme Court made the following comment in reversing a death sentence:

". . . Unless a venireman is 'irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings' . . . he cannot be excluded; if a venireman is improperly excluded even though not so committed, any subsequently imposed death penalty cannot stand."

In *Davis*, only one prospective juror had been excluded in violation of the *Witherspoon* standard.

JOHN A. FOGLEMAN, Justice, concurring in part, dissenting in part. I agree that the conviction in this case must be reversed. I do not agree that the trial court abused its discretion in denying a change of venue in this case. The evidence presented left a great deal to surmise as to the state of mind of inhabitants of the entire county. Many of the witnesses who testified in support of the motion actually did little more than

express their own opinions and reactions with little basis for knowing the attitudes of more than a few people. An opinion that it would be impossible to select 12 people from 1000 potential jurors, the identities of most of whom should have been unknown, is somewhat conjectural and the examination of 62 of them may or may not be indicative of the attitudes of the remainder. The witnesses who had discussed the case with a limited number of people (e.g., one with 50 to 75; another only with friends and social acquaintances; another with only family members; another with a half dozen or more) did not say what parts of the county these people were from or how representative they were of the entire population. At least one of the witnesses testifying in behalf of the defendant on the motion stated that the frequency of conversations about the case had "definitely reduced" by the time he testified.

I agree, however, that there were abuses of discretion in acting upon appellant's challenges for cause and that jurors who should have been excused for cause actually served on the jury. Others were peremptorily excused by appellant and his peremptory challenges were exhausted. I do not agree, however, that one, who worked for the same company as the father of the officer killed and who had some contact with the father at work and had seen him one time since the son's death, was necessarily biased, even though he naturally told the father that he was sorry to hear of his son's death on the one occasion he had seen him. Neither do I agree that a female employee of the United States Marshal's office should be excused for cause in a case involving the alleged murder of a city patrolman on that ground alone. I do think that this prospective juror's answers on voir dire required that she be excused for cause.

I do not take the majority opinion to require an automatic change of venue upon remand after the passage of 16 months since the trial. The situation may well be different since the pervasive effect of the publicity has diminished. It seems to me that the evidence showed that adjoining counties were permeated by the publicity to about the same extent as Sebastian County.

I do not agree that "probation" and "parole" are syn-

onymous. A strict construction of the capital felony murder statute should prevent our extending the statute beyond its plain words, but in my opinion, one on parole may be and usually is subject to imprisonment. My opinion is based upon the premise I will now undertake to outline.

Probation is the method of treating one found guilty of an offense, whereby he is not imprisoned, but released under supervision and upon specified conditions. Webster's New International Dictionary, 2d Ed. Parole is the conditional and revocable release of a prisoner. Webster's, 2d Ed. The former precedes and is in lieu of imprisonment. The latter follows imprisonment. It is a different manner of serving a sentence than by actual confinement. 59 Am. Jur. 2d 9, Pardon & Parole, § 10. Under Arkansas law, he remains in legal custody of the institution from which paroled. Ark. Stat. Ann. § 43-2808 (Repl. 1977). The parole board may revoke the parole and order the prisoner returned to actual custody. Ark. Stat. Ann. § 43-2810 (Repl. 1977). It is generally held that the prisoner is at all times "subject to imprisonment" as a result of being found guilty of the felony for which he was originally imprisoned. Revocation of parole simply returns the prisoner into actual confinement to serve the original sentence and is punishment for the crime for which that sentence was imposed.

Unless parole under the laws of the jurisdiction in which the parolee was sentenced and paroled differs materially from the Arkansas law, the prisoner is "subject to imprisonment" by termination of the parole until the expiration of the sentence imposed.