Charles NEAL *v.* STATE of Arkansas

CR 75-115                                    548 S.W. 2d 135

Opinion delivered March 28, 1977
(In Banc)

*Laster & Lane*, by: *James F. Lane*, for appellant.

*Jim Guy Tucker*, Atty. Gen., by: *Robert A. Newcomb*, Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Justice. The judgment sentencing appellant to death by electrocution was affirmed by us in *Neal*

v. *State*, 259 Ark. 27, 531 S.W. 2d 17. Just as was the case in *Collins* v. *State*, 259 Ark. 8, 531 S.W. 2d 13, 261 Ark. (7 Mar. 77), 548 S.W. 2d 106, the Supreme Court of the United States vacated this judgment and remanded this case to us for reconsideration in the light of *Gregg* v. *Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976); *Proffitt* v. *Florida*, 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976); *Jurek* v. *Texas*, 428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976); *Woodson and Waxton v.* North Carolina, 428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976); and *Roberts* v. *Louisiana*, 428 U.S. 325, 96 S. Ct. 3001, 49 L. Ed. 195, 548 S.W. 2d 106, and for additional reasons hereinafter stated, we adhere to the views expressed in *Neal* v. *State*, supra, 259 Ark. 27, and again affirm the judgment of the trial court.

Most of the contentions made and arguments advanced by the appellant on this reconsideration are identical to those made and advanced in *Collins* v. *State*, supra, 261 Ark. 195. Since these points were comprehensively treated in the opinion on reconsideration in that case, we will not again treat them here.

Appellant has conceded that the constitutional standards for the trial stage under Ark. Stat. Ann. § 41-4701 et seq (Supp. 1973), i.e., Act 438 of 1973, have been minimally, if not abundantly, met. In any event, we see no reason for any further discussion of the trial stage of capital felony murder prosecutions. It is the matter of appellate review on which appellant addresses us. Appellant does argue that there can be no meaningful appellate review of a death sentence in the absence of a mechanism, such as that provided by the Georgia statutes, through which the Georgia Supreme Court is provided in every case in which the death penalty is imposed with a report from the trial judge in the form of a questionnaire and an accumulation of the records of all capital cases in which sentence has been imposed after January 1, 1970, or such earlier date as the Georgia Supreme Court may deem appropriate. But appellant concedes that it was pointed out in *Proffitt* that the Florida statute has no such provisions. We find nothing in the language of any of the opinions in *Proffitt,* or in *Gregg* for that matter, to indicate that

this mechanism is an essential safeguard against the arbitrary, capricious, wanton or freakish imposition of the death penalty. In *Proffitt,* the Stewart-Powell-Stevens plurality[1] (which appellant mistakenly takes to be a majority) recognized the absence of this kind of mechanism, but [citing *State* v. *Dixon,* 283 S. 2d 1 (Fla., 1973), cert. den. 416 U.S. 943, 94 S. Ct. 1950, 40 L. Ed. 2d 295, also cited by us in *Collins* v. *State,* supra, 259 Ark. 8], found meaningful appellate review in the Florida Supreme Court's undertaking to review a case in which a defendant is sentenced to die in the light of other *decisions* to determine whether the punishment was too great and taking its function to be to "guarantee that the [aggravating and mitigating] reasons present in one case will reach a similar result to that reached under similar circumstances in another case." Even the Stewart plurality found that the Florida capital-sentencing procedures seek to assure that the death penalty will not be imposed in an arbitrary or capricious manner, and, the appellate review system, to minimize any risk to the contrary. It pointed out that the decisions of the sentencing authority were reviewed, on appeal, to ensure that they are consistent with other sentences imposed in similar circumstances.

The exemplification of the statement by the Stewart plurality that the Florida Supreme Court, had, in effect, adopted the type of proportionality review mandated by the Georgia statute was found in *Alford* v. *State,* 307 S. 2d 433 (Fla., 1975), cert. den. 428 U.S. 912, 96 S. Ct. 3227, 49 L. Ed. 2d 1221 (1976) and *Alvord* v. *State,* 322 S. 2d 533 (Fla., 1975), cert. den. 428 U.S. 923, 96 S. Ct. 3234, 49 L. Ed. 2d 1226 (1976). A careful reading of these cases shows a total absence of the mechanism which appellant deems necessary to meaningful appellate review. In those cases, the only comparisons made were related to circumstances prevailing in death penalty cases previously reviewed by the Florida court. Any thought that the United States Supreme Court, or even the Stewart plurality, would say that the Georgia mechanism is an essential constitutional safeguard is quickly dispelled by examination of the examples cited in the plurality opinion. In both *Alford* and *Alvord* the Florida Supreme Court merely compared the factual background of

---

[1]For convenience, hereinafter called the Stewart plurality.

the case being reviewed with facts disclosed in their opinions in recent cases in which the death penalty had been imposed. The Stewart plurality also found that the Texas system of prompt judicial review in a court with statewide jurisdiction provided a means to promote the evenhanded, rational and consistent imposition of death sentences under law and served to insure that sentences of death would not be wantonly or freakishly imposed. *Jurek* v. *Texas,* supra. Yet, the Texas system is not in any wise comparable to the Georgia system insofar as the mechanics emphasized by appellant are concerned. We find no merit in appellant's argument on this point.

The next argument is that no meaningful appellate review is possible because the jury's findings on aggravating and mitigating circumstances are mere "checkmark" selections of conclusions stated in statutory language without any information as to the manner in which the decision was reached. We find no great difficulty in this approach to the jury's findings. In our original opinion, we rejected the argument that the statutorily described aggravating and mitigating circumstances were unconstitutionally vague. *Neal* v. *State*, supra, 259 Ark. 27. We are unable to find anything in the *Woodson-Roberts-Gregg-Proffitt-Jurek* quintuplet offspring of *Furman* v. *Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346, to cause us to change our views in this respect. To the contrary, we find support for our holding, after comparing the enumerated circumstances in our statute with those of the Georgia statute. While recognizing that guiding standards for the sentencing authority could fail for vagueness, the Stewart plurality in *Gregg* said:

> *** While such standards are by necessity somewhat general, they do provide guidance to the sentencing authority and thereby reduce the likelihood that it will impose a sentence that fairly can be called capricious or arbitrary. Where the sentencing authority is required to specify the factors it relied upon in reaching its decision, the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capriciously or in a freakish manner.

In summary, the concerns expressed in *Furman* that

the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentending authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information.

\*\*\*\*\*

\*\*\* No longer can a Georgia jury do as Furman's jury did: reach a finding of the defendant's guilt and then, without guidance or direction, decide whether he should live or die. Instead, the jury's attention is directed to the specific circumstances of the crime: Was it committed in the course of another capital felony? Was it committed for money? Was it committed upon a peace officer or judicial officer? Was it committed in a particularly heinous way or in a manner that endangered the lives of many persons? In addition, the jury's attention is focused on the characteristics of the person who committed the crime: Does he have a record of prior convictions for capital offenses? Are there any special facts about this defendant that mitigate against imposing capital punishment (e.g., his youth, the extent of his cooperation with the police, his emotional state at the time of the crime). As a result, while some jury discretion still exists, "the discretion to be exercised is controlled by clear and objective standards so as to produce non-discriminatory application." *Coley* v. *State*, 231 Ga. 829, 834, 204 S.E. 2d 612, 615.

That plurality found that the Georgia standards, as construed by the Georgia Supreme Court, were sufficiently precise that the Georgia capital sentencing system would not violate the Eighth and Fourteenth Amendments to the United States Constitution. The White-Burger-Rehnquist concurrence seemed to have no particular problem with the assertion that the Georgia standards were too vague. It also appears to us that the standards set out in our statute are as definite as the Florida standards which seem to have been

found adequate in *Proffitt* to meet *Furman* requirements. In *Proffitt*, the Stewart plurality said:

> While these questions and decisions may be hard, they require no more line-drawing than is commonly required of a fact finder in a lawsuit. For example, juries have traditionally evaluated the validity of defenses such as insanity or reduced capacity, both of which involve the same considerations as some of the above-mentioned mitigating circumstances. While the various factors to be considered by the sentencing authorities do not have numerical weights assigned to them, the requirements of *Furman* are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition.
>
> The directions given to judge and jury by the Florida statute are sufficiently clear and precise to enable the various aggravating circumstances to be weighed against the mitigating ones. As a result, the trial court's sentencing discretion is guided and channeled by a system that focuses on the circumstances of each individual homicide and individual defendant in deciding whether the death penalty is to be imposed.

In *Jurek*, both the Stewart plurality and the White concurrence upheld the Texas system which is without any statutory enumeration of aggravating circumstances or statutory mention of mitigating circumstances.

> We have had little occasion to construe particular standards, because of the generality of the attack on them, but we still feel that the language is sufficiently specific. In this case, the jury found only one statutory aggravating circumstance, which appears to us to be very specifically defined. It appears to us that it will at least be as easy to review the record to see if there is sufficient evidentiary support for a jury's findings on these particularized circumstances as it is when a jury's general finding of guilt is questioned.

We adhere to the views expressed in our original opinion. There was certainly substantial evidence to support the one aggravating circumstance found to exist, i.e., that the murder was committed for pecuniary gain, being done in the perpetration of a robbery, out of which Neal said he netted $100. There was also sufficient evidentiary support, as we previously pointed out, for the jury's failure to find, as a mitigating circumstance, that appellant had no capacity for understanding the wrongfulness of his conduct or that he was mentally impaired or emotionally disturbed at the time of the offense.

We did not specifically mention, on the first appeal, the argument that there was no substantial evidence on which the jury could find that the youth of the defendant at the time of the commission of the capital felony was non-existent as a mitigating circumstance, but some mention is again made of his age in the briefs on this reconsideration. The evidence on which appellant relied was not his chronological age. Instead, he relied on IQ tests made when he was six, nine and fourteen years of age and the opinion of a psychologist, who made the tests, that his maximum educational attainment would be at the sixth grade level, and that, at age fourteen, he was reading at the third grade level. It must be remembered that more than five years had passed since this last evaluation was made, and that the jury not only observed Neal, but heard a statement made by him in which he sought to shift the blame for the killing to his companion. The jury also heard testimony about the plotting of the crime and the preliminary steps to divert police attention at the time of the robbery from the place to be robbed.

When the ordinary meaning of the word "youth" is considered, it is equated with juvenility and adolescence; it seems to reach its outer limits at maturity. See Webster's New International Dictionary, Second Edition; Webster's Third New International Dictionary; Rodale's, The Synonym Finder (Special Deluxe Edition); Roget's Pocket Thesaurus. It appears that appellant's date of birth was given as April 23, 1955 in his statement to the police officers. When he was fourteen, he had given a slightly different date. His accomplice testified that when the two became acquainted,

Neal said that he was twenty or twenty-one. The offense was committed on December 1, 1974, when appellant was at least nineteen years and seven months of age. At the time of the offense, Neal was old enough to vote in all elections. Amendment 23, Constitution of the United States. He could make a valid will. Ark. Stat. Ann. § 60-401 (Repl. 1971). He could not rescind a contract without making restitution. Ark. Stat. Ann. § 68-1601 (Repl. 1957); *Wheeless* v. *Eudora Bank,* 256 Ark. 644, 509 S.W. 2d 532. Although there are purposes for which Neal would not be considered to have reached full majority at the time of his trial, those pointed out above are sufficient to indicate that a jury could be justified in finding that Neal had passed the state of adolescence and juvenility. We would not be justified in saying, as appellant had urged, that the jury arbitrarily ignored uncontradicted evidence on this point.

There was also a sound basis for finding that appellant was not suffering from a mental disease or defect which impaired his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. A medical doctor, who was at the time of trial a student in advanced psychiatry and who had evaluated Neal in 1971 at the Juvenile Reception and Classification Center on the Benton State Hospital Grounds was the witness who gave the diagnosis of nonpsychotic organic brain syndrome with behavioral reaction and associated mental retardation. He arrived at this diagnosis by use of an electroencephalogram which he read as moderately abnormal. Although Neal had been given an IQ examination at the time, the results were not disclosed. This testimony was not substantiated by that of the examining neuropsychiatrist at the Arkansas State Hospital, to which Neal was committed for examination after the crime. He administered an electroencephalogram and found it to be within normal limits. We do not consider the evaluations by a psychologist when Neal was fourteen years old and younger to have any great weight. The last one did show a learning capacity at a sixth grade level. There was testimony from which the jury was justified in believing that the robbery was carefully planned and timed, after the robbers had watched the station at intervals over the period of a week from a service station directly across the street. We

could not say that there was error in the finding on this mitigating circumstance.

As in *Collins v. State,* supra, 261 Ark. 195, 548 S.W. 2d 106 (1977), we have some difficulty in finding a basis for comparison of this case with others in which the death penalty has been imposed, because there are no recent cases. As in *Collins,* we can say that we are not aware of any case in which this court has reduced a death penalty where there wrre no more mitigating circumstances than there are here. This robbery was calmly and deliberately planned and executed by Neal and his companion. The appellant and his accomplice first drove around breaking windows in several stores in order to set off burglar alarms, so the police would be diverted to answer these alarms in another area. The jury would have been justified in the belief that Neal was the executioner and that Neal fired the first, last and most of the other shots into the body of the sole attendant at the service station where the robbery was carried out. The victim was first shot when he was on the floor in a bay in the service station after he had been bound at the wrists and ankles by Neal. Seven shots were fired into his body and each of the wounds was potentially lethal. A witness testified that Neal had told him that he shot the man seven times. Both .22 caliber and .38 caliber bullets were recovered from the victim's body. There was evidence tending to show that Neal had possession of both .22 and .38 caliber weapons during the robbery and that he had obtained the .38 caliber weapon for use in the robbery. The accomplice testified that it was Neal who went into the station and finally dispatched the helpless attendant, when the two robbers drove back to check on the situation at the service station and saw the attendant using the telephone.

We certainly cannot say that the sentence resulted from passion or prejudice, that the jury's findings as to aggravating and mitigating circumstances and their weight were without sufficient evidentiary support; that there was any error in the sentencing procedure; or that the imposition of the death penalty was arbitrary, capricious or wanton. The evidence supported a finding of guilt of the degree of homicide charged. This murder was as vicious and brutal as that which took

place in *Collins*. Neal's attorney, in arguing the case to the jury, sought first to convince the jury that the accomplice was the actual killer, and then, that Neal should not suffer the death penalty. Still, he could only describe the killing as a brutal, merciless murder. The evidence showed a deliberate intention to minimize the possibility of identification by elimination of the victim of the robbery. We would not be justified in classifying the imposition of the death penalty in this case as freakish. We would not be justified in reducing the degree of the crime or the punishment. We hold that the imposition of the death penalty in this case did not violate the Eighth and Fourteenth Amendments.

We reinstate the judgment, and it is affirmed.

GEORGE ROSE SMITH, HOLT and HICKMAN, JJ., dissent only for the reasons stated in their dissents filed in *Collins* v. *State,* 261 Ark. 195, 548 S.W. 2d 106 (1977).