Paul RUIZ and Earl VAN DENTON *v.*
STATE of Arkansas

CR 78-193                                      582 S.W. 2d 915

Opinion delivered June 4, 1979
(In Banc)

878

*Don Langston* and *Robert S. Blatt,* for appellants.

*Steve Clark,* Atty. Gen., by: *Catherine Anderson,* Asst. Atty. Gen., for appellee.

JOHN I. PURTLE, Justice. On November 18, 1977, the

appellants, Paul Ruiz and Earl Van Denton, were charged by information with the offense of capital murder of Marvin Ritchie and Opal James and that they also robbed and kidnapped the victims. The trial commenced on April 17, 1978, and after four days of voir dire examination 13 jurors were selected. The trial lasted until April 27, 1978, at which time the jury found the appellants guilty of capital murder and sentenced them to death by electrocution.

Appellants had moved for a change of venue prior to the trial, alleging that pretrial publicity and ill feelings toward them made it impossible for them to receive a fair and impartial trial in Logan County. A two-day hearing was held on this motion after which it was overruled by the trial court. The motion for change of venue was renewed several times up through the actual trial of the case.

Appellants argue 16 points for reversal. Many of the points are rather long and will be condensed to state the essential error claimed in each point. The points are:

## I.

THE TRIAL COURT ERRED IN DENYING A CHANGE OF VENUE.

## II.

THE TRIAL COURT ERRED IN DENYING A MOTION TO QUASH A SUBPOENA DUCES TECUM FOR THE ASSOCIATED PRESS.

## III.

THE COURT ERRED IN OVERRULING APPELLANTS' OBJECTION TO JURORS FOR CAUSE.

## IV.

THE COURT ERRED IN EXCUSING A JUROR WHO OPPOSED THE DEATH PENALTY.

## V.

THE COURT ERRED IN REFUSING TO REDUCE THE CHARGE.

## VI.

THE COURT ERRED IN NOT HOLDING THE DEATH PENALTY, BY ELECTROCUTION, AS CRUEL AND UNUSUAL PUNISHMENT.

## VII.

THE COURT ERRED IN REFUSING TO ORDER PAYMENT OF FEES AND EXPENSES OF EXPERT WITNESSES FOR APPELLANTS.

## VIII.

THE COURT ERRED IN ADMITTING CERTAIN EXHIBITS INTO EVIDENCE.

## IX.

THE COURT ERRED IN FAILING TO DIRECT A VERDICT FOR THE APPELLANTS.

## X.

THE COURT ERRED IN OVERRULING APPELLANTS' OBJECTION TO INSTRUCTION NO. 7A.

## XI.

THE COURT ERRED IN OVERRULING APPELLANTS' OBJECTION TO INSTRUCTION NOS. 8 AND 9.

## XII.

THE COURT ERRED IN OVERRULING

APPELLANTS' OBJECTION TO INSTRUCTION NO. 10.

## XIII.

THE COURT ERRED IN OVERRULING APPELLANTS' OBJECTION TO THE STATE'S CLOSING ARGUMENT DURING THE PENALTY PHASE OF THE TRIAL.

## XIV.

THE COURT ERRED IN REFUSING TO GIVE APPELLANTS' OFFERED INSTRUCTION NO. 1.

## XV.

THE COURT ERRED IN OVERRULING APPELLANTS' OBJECTION TO THE INSTRUCTION WHICH PERMITTED THE JURY TO FIND THE APPELLANTS COMMITTED THE CAPITAL MURDER FOR PECUNIARY GAIN.

## XVI.

THE COURT ERRED IN REFUSING TO GIVE APPELLANTS' REQUESTED INSTRUCTION ON MITIGATING CIRCUMSTANCES.

Each of appellants' contentions will be taken up separately although more than one may be considered during a particular phase of this opinion.

## I.

The United States has survived as a nation through the centuries primarily because it is a nation of laws. From the beginning we have recognized that in order to maintain law and order we must be guided by principles of law which are expressly stated. The First Amendment to the Constitution of the United States requires that Congress shall make no laws prohibiting the exercise of free speech and free press. The Sixth Amendment requires that in all criminal prosecutions the

884

accused shall have the right to an "impartial" jury trial. The
Fourteenth Amendment to the United States Constitution
states:

> . . . No state shall make or enforce any law which shall
> abridge the privileges or immunities of citizens of the
> United States; nor shall any state deprive any person of
> life, liberty, or property, without due process of law; nor
> deny to any person within its jurisdiction the equal
> protection of the laws.

Art. 2, § 6, of the Constitution of Arkansas states that
the liberty of the press shall forever remain inviolate and that
the free communication of thoughts and opinion is one of the
individual rights of man and further that all persons may
freely write and publish their sentiments on all subjects, be-
ing responsible for the abuse of such right. Art. 2, § 8,
provides that no person shall be deprived of life, liberty, or
property, without *due process of law*. Art. 2, § 10, states:

> In all criminal prosecutions the accused shall enjoy the
> right to a speedy and public trial by impartial jury of the
> county in which the crime shall have been committed;
> provided that the venue may be changed to any other
> county of the judicial district in which the indictment is
> found, upon the application of the accused, in such
> manner as now is, or may be, prescribed by law; . . .

In order that these principles may be maintained as in-
tended from their inception it is necessary that the applica-
tion of these provisions, and the laws pursuant thereto, be
pursued in a manner which shows no partiality to any person
regardless of the nature of the offense or his station in life. It is
not within the province of this Court to decide whether there
should be exceptions to the constitutional requirements set
out above. Therefore, regardless of the appearance of the
guilt or innocence of an accused, we must abide by the spirit
and intent of these principles of law. Neither this Court nor
any other court is permitted to abridge the guarantees set out
in the constitution to the citizens of the State of Arkansas and
the United States. Even in an unpopular situation we must
adhere strictly to the constitution and laws and not pay mere
lip service to these guiding and controlling principles. It is

our duty and responsibility to the people of this state and nation to apply the laws with an even hand and see to it that the rights of all citizens are fully protected. We cannot give way to expediency in order to achieve what we perceive as justice if in the process we deprive any individual of his guaranteed rights. With this understanding we will continue the examination of the trial record in this case to see whether or not the appellants have been deprived of any rights guaranteed to them by the Constitution, or laws, of the State of Arkansas or the United States.

A hearing was held on November 17 and 18, 1977, on the motion for a change of venue. The following evidence was presented:

1. Affidavits of 7 citizens of Logan County stating the appellants could not receive a fair trial in the county.

2. Testimony of these same witnesses to the same effect.

3. Hundreds of newspaper articles concerning the case printed in the Southwest Times Record, Arkansas Gazette, A kansas Democrat and the Booneville Democrat. All of these publications had extensive circulation in Logan County.

4. News reel coverages from KFSM-TV and KFPW-TV, Fort Smith, KARK-TV, KTHV and KATV, Little Rock, plus many written scripts of telecast.

5. Radio logs showing coverage by KCCL, Paris, KARV, Russellville, KWHN, KFPW, KTCS, KFSA, Fort Smith.

6. November, 1977, issue of Inside Detective Magazine.

7. Testimony of 10 witnesses for the state who stated that in their opinion the appellants could receive a fair trial in Logan County.

Perhaps no episode in the history of Arkansas received

more publicity than the one involved in this case. The Associated Press released between 250 and 300 stories which went out to more than 100 newspapers. Practically all of the media stories included information that the appellants were escapees from the Oklahoma State Penitentiary at McAlester; that they were suspected of killing two people in Louisiana; that they had probably killed a taxi driver in Oklahoma; and that they were captured in Portland, Oregon. No person testified either at the change of venue hearing or during the jury selection that he had no knowledge concerning at least part of the alleged crimes attributed to the appellants. With one possible exception, no one had heard anyone state he believed the appellants were not guilty. As will be shown later, all of the jury panel was aware of most of this information. Much of the evidence received at the motion for a change of venue was in the form of news stories, some of which covered the entire front page of a paper, and were of an inflammatory nature. The various articles described the alleged escape, homicide, man hunt, apprehension, and even showed that the appellants were originally in the Oklahoma penitentiary after one being convicted of robbery and the other of murder.

The problem presented here is that of the right to a fair trial and the freedom of the press. Both are guaranteed by the Constitution of the United States and the State of Arkansas. The press has obviously rendered an invaluable service to the community, the state, and the nation in alerting the public to the situation which existed at the time. It is not inconceivable that the media may have in fact aided in the apprehension of the appellants. Certainly the court could not if it so desired, which it does not, curb the privilege of the free press. We are then left with the proposition of whether we can protect the right of a fair and impartial trial guaranteed to appellants by the constitutions. It is necessary for us to examine other cases which have dealt with this situation. The United States Supreme Court held in *Irvin v. Dowd*, 366 U.S. 717 (1961), that in some cases publicity may be so widespread that courts can presume actual malice. The court also dealt with this situation in *Bloeth v. Denno*, 313 F. 2d 364, cert. denied 372 U.S. 978 (1963). There it was held that the issue of a jury's impartiality must be determined from a review of the entire voir dire and must include the extent and nature of publicity

covering the crime. In *Denno* it was held that the jury could not honestly be found to be impartial in spite of the fact that the jurors gave assurance of impartiality. The decision went on to say that the failure to provide an unbiased trier of facts in the criminal prosecution constituted lack of "due process." In the case of *Shephard* v. *Maxwell,* 384 U.S. 333 (1966), the court stated that when a high proportion of the prospective jurors believed the defendant guilty or the voir dire examination suggested a pattern of prejudice actual bias may be presumed. It was held in *Murphy* v. *Florida,* 421 U.S. 794 (1975) that among persons who had learned from the media of the defendant's prior criminal record there was a presumption of prejudice. We believe that this Court has dealt with essentially the same situation in the case of *Swindler* v. *State,* 264 Ark. 107, 569 S.W. 2d 120 (1978). We granted the change of venue in *Swindler* when the matter was reviewed on appeal. There we stated:

> . . . The proof showed, without contradiction, that the news media had saturated the public with the fact that appellant had been released from Leavenworth prison just a week before killing Officer Basnett and that at the time of the killing he was wanted in South Carolina for the recent murder of two teenagers. The fact that appellant had been interviewed by the South Carolina authorities was also given widespread publicity. In addition to the publicity involving the killing and subsequent funeral of Officer Basnett, the Concerned Policemen's Wives Organization, some 45 strong, circulated petitions requesting two policemen to each patrol car. This organization wearing black arm bands collected between nine and ten thousand signatures. The people who signed the petition mentioned the policeman that was killed by appellant, and were told that the black arm band was worn in mourning and respect of the fallen officer.

On the motion for a change of venue in *Swindler,* supra, the trial court heard 6 witnesses state on behalf of the appellant that he could not get a fair trial and 24 witnesses for the state who stated that he could get a fair trial. In the present case we have 7 witnesses testifying that appellants could not get a fair trial in Logan County and 9 witnesses testifying

that they would be able to get a fair trial. Additionally, the evidence in *Swindler* showed that he was an escaped convict, was thought to have committed murders in another state, and many other facts almost identical with those in the case before us. The facts are so strikingly similar between *Swindler* and the present case that we are unable to distinguish between them insofar as the change of venue question is concerned.

We fully recognize that the burden of proof is on the movant when a change of venue is requested and need not cite cases in support of this statement. Such a motion is directed to the sound discretion of the trial court and is not subject to reversal except for an abuse of that discretion. *Rush* v. *State,* 238 Ark. 149, 379 S.W. 2d 29 (1964).

This judicial district is composed of three counties. The site of the trial could have been changed to any courthouse in the district and would have been more distant from the actual scene of the crime and the center of the publicity and the resentment which naturally built around this case than the site where the trial was held. Therefore, we are of the opinion that the appellants would have been more likely to have received a more fair and impartial trial had the change of venue been granted. We recognize the trial court did the best possible job that could have been done under the circumstances before him. However, the patience of Job, or the wisdom of Solomon, would have not been sufficient to erase the predetermined facts and opinions of these people who included friends or acquaintances of one or both of the murdered men.

Therefore, we hold that in this situation the trial court abused its discretion in refusing to grant the motion for a change of venue and that it constituted prejudicial error.

## II.

We see no error in the court granting the motion to quash the subpoena for the Associated Press. The evidence shows the AP issued between 250 and 300 stories. All of the news sources in circulation in Logan County were subpoenaed and responded and revealed the coverage they had

given this episode. If AP released stories to other sections of the state, it would have no bearing in this case and should properly have been denied. Additionally, it was testified that it would take at least 40 hours to gather the material requested in the subpoena. This we feel is too much of a burden to place upon a witness. At any rate, it would have only been repetitious and of no real value to the court or the jury. Therefore, we do not believe the court erred in quashing the subpoena.

## III.

The appellants were guaranteed the right of an impartial jury at their trial if they were entitled to full benefits of the Constitutions of Arkansas and the United States. It cannot be said that they were not entitled to these constitutional guarantees. We must now examine the record to determine, to the best of our ability, whether they did in fact receive a trial by a completely impartial jury. Unquestionably, the prospective jurors in Logan County are as intelligent and informed as any to be found at any other place in the country. However, human minds are subject to being impressed with information which cannot be completely eradicated. It is important that in this decision we consider each juror who was selected to try this case.

Juror No. 1 was informed about this episode, as he said, "Well, I had read like everybody else that they had escaped from McAlester." He also had read accounts, viewed television, listened to radio, and talked to members of the community about these appellants having been involved in the incident of a taxi driver in Oklahoma and that they were apprehended in Oregon. He stated he had wondered about the situation and could not help but wonder if they were not guilty. He later stated that he could set aside any opinion he had formed and judge the matter on a fair and impartial basis.

Juror No. 2 expressed an opinion that she had formed from discussing the matter with friends, neighbors, and acquaintances that they had expressed an opinion that the appellants were guilty. She stated that she had not formed a definite opinion but that the appellants would have to offer proof of their innocence. She was aware that they had es-

caped from the Oklahoma State Penitentiary, that they were supposed to have killed two people in Louisiana, and that they were apprehended in Oregon. She eventually stated that she could lay aside any opinion she had already formed and give the appellants a fair and impartial trial.

Juror No. 3 was one of two on the entire panel who had not heard much about the case and had formed no particular opinion. She also stated she could give the appellants a fair and impartial trial. Neither side objected to this juror. Therefore, there is no question concerning her eligibility or qualifications.

Juror No. 4 thought the appellants left Arkansas and "got a cab driver in Oklahoma." The juror thought they had been in the penitentiary at McAlester but was unaware of the Louisiana episode. Finally, the juror stated the appellants would be afforded a fair and impartial trial.

Juror No. 5 had heard and seen quite a lot concerning this case. She was aware that they had escaped from the Oklahoma prison where she understood they were serving life sentences for robbery and murder. Also, she knew they went to Louisiana and understood they killed two people before they came back to Arkansas. She thought they had killed a taxi driver in Oklahoma and stole a vehicle. She stated the appellants would have to be proven guilty or innocent and that it was up to someone to prove their innocence. Eventually, she also stated she could give a fair and impartial trial based upon the evidence presented.

Juror No. 6 was accepted by both parties without objection and will not be discussed further.

Juror No. 7 stated that some people she had talked to thought appellants did not deserve a fair trial. She also possessed the same type of information which other jurors had expressed. Again, her final statement was that she could lay aside any preconceived ideas and grant appellants a fair and impartial trial.

Juror No. 8 had been subjected to the same type of media coverage as the others. He was aware that they had es-

caped from the Oklahoma penitentiary, that they had abducted two fishermen in Louisiana, and that they were involved in the disappearance and death of a cab driver in Purcell, Oklahoma. He had heard a lot of people say they were guilty beyond question. He stated he could give a fair and impartial trial.

Juror No. 9 had served on a jury the previous year. Both sides attempted to waive this disqualification. At this time we should note that Ark. Stat. Ann. § 39-103 (Supp. 1977) states:

Any person who is sworn as a member of a grand or petit jury shall be ineligible to serve on another grand or petit jury in the same county for a period of two (2) years from the date such person is excused from further jury service by the Court or by operation of law.

She was also aware of the escape from Oklahoma, the Louisiana fishermen, and the Oklahoma taxi driver, who she understood was murdered. She was a Sunday school teacher and one of the victim's daughters was a member of the Sunday school class which she taught at the time. Like the others, she stated she could disregard this information and give appellants a fair and impartial trial.

Juror No. 10 had heard that they had killed two people in Louisiana, and had previously escaped from the Oklahoma penitentiary. He was aware that they had been back in Oklahoma and that a taxi driver was killed there, allegedly by appellants. On direct examination he would definitely have required the appellants to prove their innocence. He, too, finally stated he could put all of this out of his mind and give the appellants a fair and impartial trial.

Juror No. 11 had been exposed to the same type publicity the others had revealed. He had heard people express the opinion that the appellants were guilty. He was aware that they allegedly killed the taxi driver in Oklahoma. He also would be able to give a fair and impartial trial to the appellants.

Juror No. 12 had formed an opinion at least in a slight

degree. He stated he had no hard core opinion and that the state would be required to prove beyond a reasonable doubt that the appellants were guilty. He thought he was like any normal average person who had been exposed to the same information and would have some opinion, however slight. He possessed the same knowledge of other criminal incidents, including the missing fishermen in Louisiana and the killing of the taxi driver in Oklahoma. He worked at the same place with two nephews of one of the victims. The victim's nephews had told this juror that if they were in his shoes they would try to get out of serving on this jury. The nephews had visited in the juror's home and he had visited in the home of one of them. He eventually stated he could serve in the manner required of an impartial juror.

The original jury panel consisted of 179 names. 121 appeared at the beginning of the trial. 66 jurors actually were subjected to voir dire examination. All of them but two were challenged for cause by appellants. After the eighth juror was selected appellants had exhausted their pre-emptory challenges. Although the court excused 37 for cause during the voir dire, appellants still were forced to use 10 jurors whom they had challenged for cause but were seated over their objections. We do not mention the alternate juror because he was never used.

The discussion under appellants' Point No. I is necessarily interwoven with this point. Therefore, the matters stated under Point No. I are equally applicable to the present case. It is true that all of the jurors who served stated they believed they could give the appellants a fair and impartial trial. Nevertheless, 10 of those 12 had been subjected to extensive media coverage and several of them had formed an opinion that the appellants were guilty or would require proof of their innocence. We realize that the jurors were being honest when they stated they thought they could give the appellants a fair and impartial trial. However, due to the deep and prolonged exposure to frontpage newspaper stories and lead stories by the radio and television, giving saturation point coverage to the other alleged crimes, it would be almost impossible for any person to completely remove these materials from his mind while serving as a juror in this case. The material presented during the hearing on the motion for

a change of venue and during the voir dire examination revealed that there were wide spread beliefs in the community that the appellants were guilty before the trial actually started. There seems to be a pattern of ill feeling toward the appellants in the community and under these circumstances we believe bias or prejudice may be presumed. Although the exact question was not put, no juror stated that he was 100% sure that he could lay aside his previous impressions or opinions. This case is very much like *Irvin* v. *Dowd,* 366 U.S. 717 (1961), which held that where there was a pattern of deep and bitter prejudice shown to be present throughout the community, which was clearly reflected in the sum total of the voir dire examination of the jurors, wherein the court held that a fair trial was not had. The facts are also quite similar to those in the *Denno* case wherein it was held that a jury at the first degree murder prosecution did not meet standards of impartiality required by the Fourteenth Amendment where publicity was highly inflammatory, of great volume and universally accessible and entered consciences of overwhelming majority of the average talesman. *Denno* also held that the jurors giving assurances of fairness and impartiality was insufficient to overcome the presumption that under the circumstances the appellant could not receive a fair and impartial trial.

Considering the totality of the circumstances, including the voluminous adverse publicity and the general feeling in Logan County concerning the guilt of the appellants, we are of the opinion that the trial jury, as selected, did not meet the requirements of the Fourteenth Amendment to the Constitution of the United States nor the provisions of Art. 2, § 10, of the Constitution of Arkansas.

We have no right to disregard these basic requirements, regardless of the circumstances, and hold that the seating of this jury constituted reversible error.

## IV.

We agree with the trial court in excusing this juror for cause for the reason that he stated he could not under any circumstances render the death penalty. We do not believe that

*Witherspoon* v. *Illinois,* 391 U.S. 510 (1968), is controlling in this case. We think that *Witherspoon* would not prohibit the excusal of a venireman who stated unequivocally that he could not vote for the death penalty under any circumstances.

## V.

We have held the death penalty to be constitutional as the statute is now written. *Collins* v. *State,* 261 Ark. 195, 548 S.W. 2d 106 (1977), and *Swindler* v. *State,* 264 Ark. 107, 569 S.W. 2d 120 (1978). Therefore, this point is not considered valid and will not be discussed further except as it appears under other points later herein.

## VI.

We realize that the appellants desired the presence and testimony of a witness who would have testified that he thought that death by electrocution was cruel and unusual punishment. However, the court did allow the expert witness's testimony, given in another case, to be introduced and considered by the court. Aside from the fact that we do not feel the state is under any obligation to bring in an expert witness, at its expense, on behalf of the appellants, we feel that the request of the appellants was essentially complied with in this case. Death in any manner may be considered cruel and unusual by some people. Certainly a death caused by disease or accident can be very cruel. The State of Arkansas, through the General Assembly, which represents the people, has elected to use the electric chair in death sentences. If a death sentence is constitutional at all, and we have held that it is, the method of enforcing the sentence must be left to the people, acting through the General Assembly. Some method must be used and the appellants have not offered one which they consider suitable. In view of our ruling on prior points, we do not deem it necessary to discuss this point further.

## VII.

This matter was discussed under Point No. VI. We think the appellants have no standing to argue this point in view of the fact that their expert witness's testimony in another case

was at least partially accepted into the record by the court. We do not construe Ark. Stat. Ann. § 41-1301, et seq., (Repl. 1977), to require the state to furnish such expert testimony as requested in this case. We refer to our prior situations holding the death penalty as imposed is not cruel and unusual punishment. See also *Pickens v. State*, 261 Ark. 756, 551 S.W. 2d 212 (1977); *Neal v. State*, 261 Ark. 336, 548 S.W. 2d 135 (1977); and *Giles v. State*, 261 Ark. 413, 549 S.W. 2d 479 (1977). These cases were decided subsequent to *Gregg v. Georgia*, 428 U.S. 153 (1976).

## VIII.

We do not feel the trial court erred in admitting into evidence the exhibits which were objected to by appellants. The bullet from David Small's arm was fired into him while he lay handcuffed to Marvin Ritchie in the trunk of an automobile. It was fired about the same time that Marvin Ritchie was killed. State's Exhibit No. 2 was a picture of the body of Marvin Ritchie in the trunk of the vehicle where he was murdered. It is true that David Small had been unhandcuffed from Ritchie's body before the picture was made. However, that does not change the circumstances sufficiently to render the photograph inadmissible as not depicting the scene and the circumstances as they existed when discovered. This was explained to the jury and the photograph may have been some help to them in reaching a decision in this matter. It is noted that the photograph is not one which would be calculated to arouse the passion of the jury. State's Exhibit No. 10 was a closeup picture of the bullet wound in the body of Marvin Ritchie. Again, this photograph does not appear one which would inflame the passion of the jurors any more than a statement of the fact that he had been murdered. The location of this wound on the body of the victim, coupled with the testimony of David Small, certainly could have been of some assistance to the jury in their deliberations. Admittedly, it is of little probative value. Nevertheless, we cannot say it was prejudicial. So far as the statement of the prosecuting attorney that he was "merely getting at the truth" is concerned, we feel that any error caused by such statement was cured by the court's instruction to the jury in telling them to disregard the remark made by the prosecuting attorney. We do not think the court erred in overruling the appellants' motions

and objections concerning the testimony and exhibits relating to the death of Opal James. Although the death of James was a day later and in another county, it, nevertheless, was a part of the continuing episode in which these appellants were engaged at the time.

We do not agree that it was error for the court to admit into evidence State's Exhibit No. 24 which was a copper jacket of a bullet found at the scene of the body of Opal James. It was testified that the jacket was fired from the same weapon which was taken from the appellants. It was apparently the same gun which fired at least some of the bullets at the time Ritchie and Small were shot. Certainly there is evidence to connect the jacket with a gun found in the possession of the appellants.

Neither do we agree that the testimony of the ballistics expert was inadmissible. The weakest part of his testimony was that he could not identify a bullet as having been fired from the pistol found in appellants' vehicle when they were arrested. However, he did testify that it was from the same type of weapon which was found in appellants' vehicle. We think this is corroborative of other' testimony and it was proper for the court to allow the jury to hear it. Again, it may be of little probative value but, nevertheless, it was not improper to allow it to be considered by the jury.

## IX.

We fail to understand why appellants would seriously ask us to declare that the evidence in this case was insufficient to support the verdict rendered by the jury. The fact that Marvin Ritchie was killed on the morning of June 29, 1977, and that Opal James was killed 13 to 14 hours later, in Montgomery County or Scott County, does not prove that these two men were not killed in the same criminal episode. Even if we were to consider the two homicides as separate crimes, it would not change the results as each was involved in both. We must consider all of the circumstances and in so doing we cannot say that there was not evidence to show this was part of one continuing criminal episode. The fact that the victims were robbed during the time they were held captive does not prove that robbery was not the motive for the entire

episode. This fact is a matter that is clearly within the domain of the jury when considering all the evidence. The information itself stated that Paul Ruiz and Earl Van Denton were charged with the premeditated and deliberated murder of Marvin Ritchie and Opal James and with the crimes of robbery and kidnapping. From the beginning the state contended this was one continuing episode. We must consider the matter in the light most favorable to the state and we hold that all of the evidence objected to was properly admitted. See *Grigsby v. State*, 260 Ark. 499, 542 S.W. 2d 275 (1976).

## X.

Instruction No. 7A was given over the objection of appellants. The instruction is simply a standard instruction on circumstantial evidence. It is the contention of appellants that the only evidence properly admitted was direct. We disagree. Practically all of the evidence relating to the Opal James portion of this episode was circumstantial. It is obvious that both direct and circumstantial evidence were presented during the course of the trial. In the case of *Murray v. State*, 249 Ark. 887, 462 S.W. 2d 438 (1971), cited by appellant, we stated:

> . . . Of course, the direct evidence from the state's witnesses, and even of appellant himself, established that Morgan was killed during the perpetration of the robbery. In other words, it was not necessary to show that Murray actually fired the shots that killed Morgan. For that matter, we have held that the refusal to give instructions on circumstantial evidence even where the case depends wholly upon such evidence, is not error if the court has already fully and correctly instructed the jury upon the credibility of witnesses, the weight of the evidence, the presumption of innocence, and reasonable doubt. *Ridenhour v. State*, 184 Ark. 475, 43 S.W. 2d 60. . .

The request in *Murray* was for the instruction on circumstantial evidence. In the present case there is an objection to the instruction. In *Covey v. State*, 232 Ark. 79, 334 S.W. 2d 648 (1960), and quoted with approval in *Harris v. State*, 239 Ark. 771, 394 S.W. 2d 135 (1965), we stated that such instruction

was correct in a situation such as we have here. Certainly both men could not have driven the vehicle at the same time and neither could both men have fired the same weapon at the same time. It does not make any difference in the final result whether they were accomplices or principals because the punishment is the same for either.

## XI.

Since the effective date of the Arkansas Criminal Code in 1976, we have essentially done away with the distinction of an accomplice. Under the Code we find no essential difference in an accomplice and the principal. Each participant in a crime is liable for his own conduct but he cannot disclaim responsibility for all of the conduct in a particular episode because he did not personally take part in every act which it took to accomplish the crime.

In *Andrews & Goodman v. State*, 262 Ark. 190, 555 S.W. 2d 224 (1977), in discussing accomplice we stated:

> . . . The word "accomplice" does not imply (as "accessory" once did) that either is subordinate to the other. It is simply a shorthand way of saying that both are responsible. That point is made clear by § 301 of the Code, which reads:

> "A person may commit an offense either by his own conduct or that of another person." Ark. Stat. Ann. § 41-301. Thus each participant is criminally liable, ultimately, only for his own conduct, but he cannot disclaim responsibility merely because he did not personally take part in every act that went to make up the crime as a whole.

There is no distinction between principals on the one hand and accomplices on the other hand, insofar as criminal liability is concerned. Ark. Stat. Ann. § 41-301 and § 41-303 (Repl. 1977). In *Parker v. State*, 265 Ark. 315, 578 S.W. 2d 206 (1979), we discussed the propriety of charging one as a principal and subsequently giving an instruction on accomplice. The prosecuting attorney had informed the trial court during the voir dire that the state would request an instruction to the

jury on accomplice's liability although the information had charged the accused as a principal. In *Parker* we stated:

> At the conclusion of all the evidence, the trial judge gave a correct instruction stating that a person is criminally liable for the conduct of another, when he is an accomplice to the other in the commission of a crime and defining an accomplice in the language of Ark. Stat. Ann. § 41-303 (Repl. 1977). This definition includes one who solicits another to commit an offense, or who aids or attempts to aid another in planning or committing it. This instruction was given over the objection of appellant on the grounds heretofore stated and on the ground that the instruction did not require that it be shown that the defendant must have received something of value before he could be found guilty as an accomplice.

Appellants attempt to distinguish between *Andrews & Goodman* v. *State,* supra, and the present case. We are unable to find such a distinction that would prevent the court from properly giving the instruction concerning an accomplice. Therefore, it was not error for the court to give Instruction Nos. 8 and 9 concerning an accomplice.

## XII.

Both appellants and appellee treated this instruction under the argument in Point No. XI. We do likewise and hold it was proper to give Instruction No. 10 for the reasons stated in *Andrews & Goodman* v. *State,* supra.

## XIII.

Counsel for appellants first argued to the jury the issue of what 'life without parole' means. In reply the prosecuting attorney stated:

> Life can be commuted sometimes, and generally is. But that is not a hard and fast law. They were serving life sentences, ladies and gentlemen, at the penitentiary which is built just as good as ours is, and they sure

weren't there on the 29th, or two days later when they were busy killing off our local citizens around here. . . .

There is no question that the clemency remarks by the prosecuting attorney would have been improper had the matter not been invited by appellants. Appellants opened up this subject and we cannot say under the particular circumstances that this was reversible error in this case. We have stated that it is permissible for the state, in its concluding argument, to comment upon the matters which were discussed or invited by appellants preceding closing argument. *Rooks v. State,* 250 Ark. 561, 466 S.W. 2d 478 (1971). Upon retrial this situation is not likely to arise.

## XIV.

This argument has been at least partially considered in prior points of this opinion. However, we will discuss it a little further at this time. Appellants' Instruction No. 1 would have made it a fact question for the jury to determine whether the death penalty by electrocution was cruel and unusual punishment. The court properly rejected this instruction because it is not a fact issue for the jury to determine.

Appellants contend that this Court held in *Collins* v. *State,* 259 Ark. 8, 531 S.W. 2d 13 (1975), that the absence of evidence in the record about the cruel nature of electrocution prevented this Court from ruling on the matter. We do not agree with this argument. In *Collins* we stated:

In a related point for reversal the appellant argues that death by electrocution is unconstitutionally cruel. Counsel concedes that the Supreme Court has upheld this method of capital punishment. *Louisiana ex rel. Francis* v. *Resweber,* 329 U.S. 459 (1947); *In re Kimmler,* 136 U.S. 436 (1890). It is insisted, however, on the basis of books or articles having to do with capital punishment, that death by electrocution is not necessarily instantaneous and may subject the condemned person to extreme pain.

We are not convinced by this argument. As the court indicated in *Kimmler,* supra, the constitution prohibits

punishments involving torture and other *unnecessary* cruelty. It is doubtless true that some pain may attend any form of execution, whether by electrocution, hanging, the gas chamber, or the firing squad. But the record contains no proof on the subject, as it did in *Kimmler,* and we certainly cannot take judicial notice that electrocution is needlessly cruel.

We did state that the record in *Collins,* supra, did not contain evidence concerning death by electrocution and the effects thereof on the person being electrocuted. However, in the present case evidence relating to the physical reaction of death by electrocution has been considered by the trial court. The court obviously ruled that this type of execution is not cruel and unusual. We agree with the ruling by the court. There is no satisfactory method of putting a person to death. No method yet devised guarantees there will be no pain or discomfort during the process of execution. Since the United States Supreme Court has ruled that death by electrocution is not prohibited by the constitution, we must hold that the trial court was correct. See *Pickens* v. *State,* supra; *Neal* v. *State,* supra; *Giles* v. *State,* supra; and *Gregg* v. *Georgia,* supra.

## XV.

The aggravating circumstances presented on form A as instruction F were taken directly from the Arkansas statute. It is a proper statement of the law. The evidence in this case shows that appellants held Opal James and David Small at gunpoint and ordered them to hand over their wallets. Nothing could more clearly indicate robbery than this action. No one argues that robbery is not ordinarily committed for pecuniary gain. Appellants contend that the robbery was committed for the purpose of keeping their location hidden. There is no reason to believe that the money or wallets would have revealed anything concerning the location of the appellants. We cannot accept the argument that the robberies were just committed for no particular reasons. It has been held that where the robbery and the murder are so closely connected in point of time, place and continuity of action, as to constitute one continuous episode, it is proper to consider them as a single transaction and that the homicide is a part of the res gestae of the robbery. *Bizup* v. *People,* 150 Col.

214, 371 Pa. 2d 786, cert. denied, 371 U.S. 873 (1962). Opal James was killed subsequent to the robbery and the jury could well have found that it was for the purpose of keeping him from telling about the robbery. We see no reversible error by giving this instruction in view of the circumstances which were presented to the jury. *Grigsby* v. *State,* supra.

## XVI.

We agree with the appellants that if there was any evidence in the record to support the giving of requested mitigating instructions A, C and D that such instructions should have been given. However, it stretches one's imagination to believe that an accused is entitled to an instruction on mental or emotional disturbance based upon their escape from the Oklahoma penitentiary or the fact that they were accused of murdering people in Louisiana and Oklahoma in addition to those for which they were being tried. This evidence, if it sheds any light at all on the subject, would indicate that there certainly was a lack of mental or emotional pressure. In fact, it shows a lack of conscience of any kind. We do not agree that the evidence justifies a mitigating instruction concerning extreme mental and emotional disturbance. We also consider the fact that appellants were given a psychiatric evaluation and determined to be without psychosis. The record does not reveal any evidence of intoxication at all concerning the period of time in which this episode occurred. The fact that beer cans were found around an area where they had stopped in Arkansas and that alcoholic beverages, and empty containers, were found in their vehicle many days later when they were apprehended in Oregon does not rise to the level of evidence at all.

As far as the third request, requested instruction D, the appellants admit that they were 27 and 29 years of age, respectively. It would stretch one's imagination indeed to treat these appellants as youthful offenders. Appellants rely on *Collins,* supra, to support their claim for instruction on the youth of the appellants. Collins was 20 years old when he was convicted. We held that Collins was entitled to this instruction because of his age but stated he was entitled to very little consideration. However, we do not agree that appellants

were entitled to such instruction and it, therefore, was not error to refuse to give it.

Reversed and remanded.