No. 84–6030. GLASS v. LOUISIANA. Sup. Ct. La. Certiorari denied.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting from denial of certiorari.

The petitioner Jimmy L. Glass has been condemned to death by electrocution—"that is, causing to pass through the body of the person convicted a current of electricity of sufficient intensity to cause death, and the application and continuance of such current through the body of the person convicted until such person is dead." La. Rev. Stat. Ann. § 15:569 (West 1981). Glass contends that "electrocution causes the gratuitous infliction of unnecessary pain and suffering and does not comport with evolving standards of human dignity," and that this method of officially sponsored execution therefore violates the Eighth and Fourteenth Amendments. Pet. for Cert. 27. The Supreme Court of Louisiana held that this claim must summarily be rejected pursuant to "clearly established principles of law" and observed that, in any event, the claim is wholly lacking in medical or scientific merit. 455 So. 2d 659, 660, 671 (1984).

I adhere to my view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, Gregg v. Georgia, 428 U. S. 153, 227 (1976) (BRENNAN, J., dissenting), and would therefore grant certiorari and vacate Glass' death sentence in any event. One of the reasons I adhere to this view is my belief that the "physical and mental suffering" inherent in any method of execution is so "uniquely degrading to human dignity" that, when combined with the arbitrariness by which capital punishment is imposed, the trend of enlightened opinion, and the availability of less severe penological alternatives, the death penalty is always unconstitutional. Furman v. Georgia, 408 U. S. 238, 287–291 (1972).

Even if I thought otherwise, however, I would vote to grant certiorari. Glass' petition presents an important and unsettling

question that cuts to the very heart of the Eighth Amendment's Cruel and Unusual Punishments Clause[1]—a question that demands measured judicial consideration. Of the 42 officially sponsored executions carried out since the Court's decision in *Gregg* v. *Georgia, supra,* 31 have been by means of electrocution.[2] And since *Gregg,* an ever-increasing number of condemned prisoners have contended that electrocution is a cruel and barbaric method of extinguishing human life, both *per se* and as compared with other available means of execution. As in this case, such claims have uniformly and summarily been rejected,[3] typically on the strength of this Court's opinion in *In re Kemmler,* 136 U. S. 436 (1890), which authorized the State of New York to proceed with the first electrocution 95 years ago. *Kemmler,* however, was grounded on a number of constitutional premises that have long since been rejected and on factual assumptions that appear not to have withstood the test of experience. I believe the time has come to measure electrocution against well-established contemporary Eighth Amendment principles.

---

[1] The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted.*" (Emphasis added.)

[2] See American Civil Liberties Union, Death-Row Census (Mar. 1, 1985). On the prevalence of electrocution, see also The Death Penalty in America 16 (H. Bedau ed., 3d ed., 1982) (hereinafter Bedau); Gardner, Executions and Indignities—An Eighth Amendment Assessment of Methods of Inflicting Capital Punishment, 39 Ohio St. L. J. 96, 119, and n. 164 (1978).

[3] See, *e. g., Sullivan* v. *Dugger,* 721 F. 2d 719, 720 (CA11 1983) (order); *Spinkellink* v. *Wainwright,* 578 F. 2d 582, 616 (CA5 1978), cert. denied, 440 U. S. 976 (1979); *Dix* v. *Newsome,* 584 F. Supp. 1052, 1068 (ND Ga. 1984); *Mitchell* v. *Hopper,* 538 F. Supp. 77, 94 (SD Ga.), supp. op. *sub nom. Ross* v. *Hopper,* 538 F. Supp. 105 (1982), aff'd in part and vacated in part on other grounds *sub nom. Spencer* v. *Zant,* 715 F. 2d 1562 (CA11), and aff'd in part and rev'd in part on other grounds, 716 F. 2d 1528 (1983); *McCorquodale* v. *Balkcom,* 525 F. Supp. 408, 430–431 (ND Ga. 1981), aff'd in part and rev'd in part, 705 F. 2d 1553 (CA11), on rehearing, 721 F. 2d 1493 (1983), cert. denied, 466 U. S. 954 (1984); *Ruiz* v. *State,* 265 Ark. 875, 900–901, 582 S. W. 2d 915, 927–928 (1979), cert. denied, 454 U. S. 1093 (1981); *Booker* v. *State,* 397 So. 2d 910, 918 (Fla.), cert. denied, 454 U. S. 957 (1981); *Godfrey* v. *Francis,* 251 Ga. 652, 670, 308 S. E. 2d 806, 820, cert. denied, 466 U. S. 945 (1984); *State* v. *Shaw,* 273 S. C. 194, 206, 255 S. E. 2d 799, 804–805, cert. denied, 444 U. S. 957 (1979); *Martin* v. *Commonwealth,* 221 Va. 436, 439, 271 S. E. 2d 123, 125 (1980).

I

Electrocution as a means of killing criminals was first authorized by the New York Legislature in 1888, and resulted from a lengthy investigation to identify "the most humane and practical method known to modern science of carrying into effect the sentence of death in capital cases."[4]   In *In re Kemmler, supra,* this Court rejected a constitutional attack on New York's statute by William Kemmler, who was scheduled to be the first person put to death by electrocution.   The Court emphasized that, because the Eighth Amendment was not applicable to the States, "[t]he decision of the state courts sustaining the validity of the act under the state constitution is not reexaminable here."   *Id.,* at 447.[5]   In dicta, the Court also followed a "historical" interpretation of the Cruel and Unusual Punishments Clause as it governed executions carried out by the Federal Government, suggesting that the constitutionality of a particular means of execution should be determined by reference to contemporary norms at the time the Bill of Rights was adopted.   See *id.,* at 446–447.   In addition, the Court approvingly observed that the state court had concluded that " 'it is within easy reach of electrical science at this day to so generate and apply to the person of the convict a current of electricity of such known and sufficient force as *certainly* to produce *instantaneous,* and, therefore, *painless,* death.' "   *Id.,* at 443 (emphasis added).

State and federal courts recurrently cite to *Kemmler* as having conclusively resolved that electrocution is a constitutional method of extinguishing life, and accordingly that further factual and legal

---

[4] See Report of the Commission to Investigate and Report the Most Humane and Practical Method of Carrying Into Effect the Sentence of Death in Capital Cases 3 (transmitted to the Legislature of the State of New York, Jan. 17, 1888).   See generally Bedau 15; L. Lawes, Life and Death in Sing Sing 183–186 (1928) (hereinafter Lawes); N. Teeters, Hang By The Neck 446 (1967) (hereinafter Teeters); Beichman, The First Electrocution, 35 Commentary 410, 411 (1963).   Some contemporary observers described the so-called Electrical Execution Law as a means to ensure "euthanasia by electricity." *Id.,* at 411.

[5] The Court concluded that the challenged statute was reviewable only to determine whether its enactment "was in itself within the legitimate sphere of the legislative power of the State, and in the observance of those general rules prescribed by our systems of jurisprudence."   136 U. S., at 449.   See also *McElvaine* v. *Brush,* 142 U. S. 155, 158–159 (1891).

consideration of the issue is unnecessary. See n. 3, *supra*. But *Kemmler* clearly is antiquated authority. It is now well established that the Eighth Amendment applies to the States through the Fourteenth Amendment. See, *e. g.*, *Gregg* v. *Georgia*, 428 U. S., at 168 (opinion of Stewart, POWELL, and STEVENS, JJ.); *Robinson* v. *California*, 370 U. S. 660 (1962). Moreover, the Court long ago rejected *Kemmler*'s "historical" interpretation of the Cruel and Unusual Punishments Clause, emphasizing instead that the prohibitions of the Clause are not "confine[d] . . . to such penalties and punishment as were inflicted by the Stuarts." *Weems* v. *United States*, 217 U. S. 349, 372 (1910). This is because "[t]ime works changes, [and] brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth." *Id.*, at 373. The Clause thus has an "expansive and vital character," *id.*, at 377, that "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society," *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (plurality opinion).[6] Accordingly, Eighth Amendment claims must be evaluated "in the light of contemporary human knowledge," *Robinson* v. *California*, *supra*, at 666, rather than in reliance on century-old factual premises that may no longer be accurate.

To be sure, legislative decisions concerning appropriate forms of punishment are entitled to considerable deference. But in common with all constitutional guarantees, "it is evident that legislative judgments alone cannot be determinative of Eighth Amendment standards since that Amendment was intended to safeguard individuals from the abuse of legislative power." *Gregg* v. *Georgia*, *supra*, at 174, n. 19 (opinion of Stewart, POWELL, and STEVENS, JJ.); see also *Weems* v. *United States*, *supra*, at 371–373.[7] "[T]he Constitution contemplates that in the end [a court's] own judgment will be brought to bear on the question of the acceptability" of a challenged punishment, guided by "objective

---

[6] See also *Estelle* v. *Gamble*, 429 U. S. 97, 102 (1976) (methods of punishment cannot trangress contemporary "'broad and idealistic concepts of dignity, civilized standards, humanity, and decency'").

[7] Were it otherwise, the Cruel and Unusual Punishments Clause would be rendered "little more than good advice," *Trop* v. *Dulles*, 356 U. S. 86, 104 (1958) (plurality opinion), and "[i]ts general principles would have little value and be converted by precedent into impotent and lifeless formulas," *Weems* v. *United States*, 217 U. S., at 373.

factors to the maximum possible extent." *Coker* v. *Georgia*, 433 U. S. 584, 592, 597 (1977) (plurality opinion). Thus it is firmly within the "historic process of constitutional adjudication" for courts to consider, through a "discriminating evaluation" of all available evidence, whether a particular means of carrying out the death penalty is "barbaric" and unnecessary in light of currently available alternatives. *Furman* v. *Georgia*, 408 U. S., at 420, 430 (POWELL, J., dissenting).

What are the objective factors by which courts should evaluate the constitutionality of a challenged method of punishment? First and foremost, the Eighth Amendment prohibits "the unnecessary and wanton infliction of pain." *Gregg* v. *Georgia*, *supra*, at 173 (opinion of Stewart, POWELL, and STEVENS, JJ.). See also *Coker* v. *Georgia*, *supra*, at 592 (plurality opinion) (a punishment is excessive if it is "nothing more than the purposeless and needless imposition of pain and suffering"); *Louisiana ex rel. Francis* v. *Resweber*, 329 U. S. 459, 463 (1947) ("The traditional humanity of modern Anglo-American law forbids the infliction of unnecessary pain in the execution of the death sentence"). The Court has *never* accepted the proposition that notions of deterrence or retribution might legitimately be served through the infliction of pain beyond that which is minimally necessary to terminate an individual's life.[8] Thus in explaining the obvious unconstitutionality of such ancient practices as disemboweling while alive, drawing and quartering, public dissection, burning alive at the stake, crucifixion, and breaking at the wheel, the Court has emphasized that the Eighth Amendment forbids "inhuman and barbarous" methods of execution that go at all beyond "the mere extinguishment of life" and cause "torture or a lingering death." *In re Kemmler*, 136 U. S., at 447. It is beyond debate that the Amendment proscribes all forms of "unnecessary cruelty" that cause gratuitous "terror, pain, or disgrace." *Wilkerson* v. *Utah*, 99 U. S. 130, 135–136 (1879).[9]

---

[8] See, *e. g.*, *Furman* v. *Georgia*, 408 U. S. 238, 392 (1972) (BURGER, C. J., dissenting) ("The dominant theme of the Eighth Amendment debates was that the ends of the criminal laws cannot justify the use of measures of extreme cruelty to achieve them").

[9] See also *id.*, at 279 (BRENNAN, J., concurring); *id.*, at 430 (POWELL, J., dissenting) ("[N]o court would approve any method of implementation of the death sentence found to involve unnecessary cruelty in light of presently available alternatives"); *Louisiana ex rel. Francis* v. *Resweber*, 329 U. S. 459, 473–474 (1947) (Burton, J., dissenting) ("Taking human life by unnecessarily

The Eighth Amendment's protection of "the dignity of man," *Trop* v. *Dulles, supra,* at 100 (plurality opinion), extends beyond prohibiting the unnecessary infliction of pain when extinguishing life. Civilized standards, for example, require a minimization of physical violence during execution irrespective of the pain that such violence might inflict on the condemned. See, *e. g.,* Royal Commission on Capital Punishment, 1949–1953 Report ¶732, p. 255 (1953) (hereinafter Royal Commission Report). Similarly, basic notions of human dignity command that the State minimize "mutilation" and "distortion" of the condemned prisoner's body. *Ibid.* These principles explain the Eighth Amendment's prohibition of such barbaric practices as drawing and quartering. See, *e. g., Wilkerson* v. *Utah, supra,* at 135.

In evaluating the constitutionality of a challenged method of capital punishment, courts must determine whether the factors discussed above—unnecessary pain, violence, and mutilation—are *"inherent* in the method of punishment." *Louisiana ex rel. Francis* v. *Resweber, supra,* at 464 (emphasis added). A single, unforeseeable accident in carrying out an execution does not establish that the method of execution itself is unconstitutional. Cf. *Estelle* v. *Gamble,* 429 U. S. 97, 105 (1976). Thus in *Louisiana ex rel. Francis* v. *Resweber, supra,* the Court allowed a State to proceed with a second effort to electrocute a prisoner after a mechanical failure had interrupted the first attempt.[10] The Court emphasized that the initial failure had been an "unforeseeable accident," 329 U. S., at 464, and Justice Frankfurter's concurrence stressed that the failure had been an "innocent misadventure," *id.,* at 470.

A different case would be presented, however, if the Court were confronted with "a series of abortive attempts." *Id.,* at 471.

---

cruel means shocks the most fundamental instincts of civilized man. It should not be possible under the constitutional procedure of a self-governing people. . . . The all-important consideration is that the execution shall be so instantaneous and substantially painless that the punishment shall be reduced, as nearly as possible, to no more than that of death itself").

[10] The issue in *Resweber* was whether repeated attempts to electrocute a person were unconstitutional, not whether electrocution was *per se* cruel and unusual punishment. The plurality obviously believed that electrocution in the abstract was not constitutionally forbidden, and even the dissent assumed that electrocution generally was so "instantaneous" and "painless" that it would not present constitutional difficulties. *Id.,* at 474 (Burton, J., dissenting).

This is because the Eighth Amendment requires that, as much as humanly possible, a chosen method of execution minimize the risk of unnecessary pain, violence, and mutilation.[11]  If a method of execution does not satisfy these criteria—if it causes "torture or a lingering death" in a significant number of cases, *In re Kemmler*, 136 U. S., at 447—then unnecessary cruelty inheres in that method of execution and the method violates the Cruel and Unusual Punishments Clause.

## II

Because contemporary courts have summarily rejected constitutional challenges to electrocution, the evidence respecting this method of killing people has not been tested through the adversarial truthfinding process.  There is considerable empirical evidence and eyewitness testimony, however, which if correct would appear to demonstrate that electrocution violates every one of the principles set forth above.[12]  This evidence suggests that death by electrical current is extremely violent and inflicts pain and indignities far beyond the "mere extinguishment of life." *Ibid.*[13]  Witnesses routinely report that, when the switch is

---

[11] We have emphasized in procedural contexts that the Eighth Amendment requires that all feasible measures be taken to minimize the risk of mistakes in administering capital punishment.  See, *e. g.*, *Zant* v. *Stephens*, 462 U. S. 862, 884–885 (1983); *Eddings* v. *Oklahoma*, 455 U. S. 104, 118 (1982) (O'CONNOR, J., concurring).  See also Royal Commission Report ¶ 729, at 255 (importance of determining "which method [of execution] is most likely to avoid mishaps").

[12] Details concerning the actual process of electrocution are not widely known, primarily because "executions are carried out in private; there are few witnesses; pictures are not allowed; and newspaper accounts are, because of 'family newspaper' requirements of taste, sparing in detail."  Hearings on H. R. 8414 et al. before Subcommittee No. 3 of the House Committee on the Judiciary, 92d Cong., 2d Sess., 308 (1972) (hereinafter 1972 Hearings).  See also *Furman* v. *Georgia, supra*, at 297 (BRENNAN, J., concurring); Camus, Reflections on the Guillotine, in Resistance, Rebellion, and Death 187 (1961) ("The man who enjoys his coffee while reading that justice has been done would spit it out at the least detail").

[13] The technical aspects of electrocution, briefly stated, are that the authorities bind the condemned to a wooden chair with leather straps, affix electrodes to his shaven head and right leg, and partially cover his face with a mask.  When the switch is thrown, an "initial voltage of 2,000 to 2,200 and amperage of 7 to 12" are sent "hurtling through the prisoner's body," and the voltage and amperage subsequently "are lowered and reapplied at various intervals" until the prisoner is dead.  Lawes 170.

thrown, the condemned prisoner "cringes," "leaps," and "'fights the straps with amazing strength.'"[14] "The hands turn red, then white, and the cords of the neck stand out like steel bands."[15] The prisoner's limbs, fingers, toes, and face are severely contorted.[16] The force of the electrical current is so powerful[17] that the prisoner's eyeballs sometimes pop out and "rest on [his] cheeks."[18] The prisoner often defecates, urinates, and vomits blood and drool.[19]

"The body turns bright red as its temperature rises," and the prisoner's "flesh swells and his skin stretches to the point of breaking."[20] Sometimes the prisoner catches on fire, particularly "if [he] perspires excessively."[21] Witnesses hear a loud and sustained sound "like bacon frying," and "the sickly sweet smell of burning flesh" permeates the chamber.[22] This "smell of frying

---

[14] Hearings on S. 1760 before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 90th Cong., 2d Sess., 20 (1968) (hereinafter 1968 Hearings) (statement of Clinton Duffy, former Warden of San Quentin); Lawes 170; 1972 Hearings, at 305. See also Teeters 448 ("'The figure in the chair gives one terrific lurch against the straps, every muscle contracting and straining. The face—all that can be seen from mouth to throat—turns crimson'") (quoting Dr. Amos Squire, Sing Sing prison).

[15] Lawes 170.

[16] C. Duff, A Handbook on Hanging 119–120 (1974) (hereinafter Duff).

[17] "The force of the death-dealing blow the condemned prisoner receives is more easily understood when it is realized that this amount of electricity, transferred into mechanical power, would be equivalent to 884,400 foot-pounds per minute, or enough electrical energy to light 800 lights in the average home." Lawes 189.

[18] 1968 Hearings, at 20 (statement of Clinton Duffy); see also Rubin, The Supreme Court, Cruel and Unusual Punishment, and the Death Penalty, 15 Crime and Delinquency 121, 129 (1969). In addition, the force of the current is so strong that it sometimes literally ruptures the prisoner's heart. Duff 120.

[19] Tyler, Electrocution As a Spectator Sport, 2 Fact 47, 50–51 (Mar.-Apr. 1965); see also 1968 Hearings, at 20 (statement of Clinton Duffy).

[20] Gardner, 39 Ohio St. L. J., supra n. 2, at 126; 1968 Hearings, at 20 (statement of Clinton Duffy). See also G. Bishop, Executions: The Legal Ways of Death 27 (1965).

[21] Rubin, 15 Crime and Delinquency, supra n. 18, at 128; see also 1972 Hearings, at 305; Teeters 448.

[22] Tyler, 2 Fact, supra n. 19, at 50. One veteran observer once commented: "Only the greenhorns sit in the first row. We sit behind. The smell is too bad." Id., at 49. See generally 1968 Hearings, at 20 (statement of Clinton Duffy); Bedau 16; Teeters 449; Rubin, 15 Crime and Delinquency, supra n. 18, at 128.

human flesh in the immediate neighbourhood of the chair is sometimes bad enough to nauseate even the Press representatives who are present."[23]   In the meantime, the prisoner almost literally boils: "the temperature in the brain itself approaches the boiling point of water," and when the postelectrocution autopsy is performed "the liver is so hot that doctors have said that it cannot be touched by the human hand."[24]   The body frequently is badly burned and disfigured.[25]

The violence of killing prisoners through electrical current is frequently explained away by the assumption that death in these circumstances is instantaneous and painless.[26]   This assumption, however, in fact "is open to serious question" and is "a matter of sharp conflict of expert opinion."[27]   Throughout the 20th century a number of distinguished electrical scientists and medical doctors have argued that the available evidence strongly suggests that electrocution causes unspeakable pain and suffering.   Because " '[t]he current flows along a restricted path into the body, and destroys all the tissue confronted in this path . . . [i]n the meantime the vital organs may be preserved; and pain, too great for us to imagine, is induced. . . . For the sufferer, time stands still; and this excruciating torture seems to last for an eternity.' "[28] L. G. V. Rota, a renowned French electrical scientist, concluded after extensive research that

> "[i]n every case of electrocution, . . . death inevitably supervenes but it may be very long, and above all, excruciatingly painful . . . .   [T]he space of time before death supervenes varies according to the subject.   Some have a greater physiological resistance than others.   I do not believe that anyone killed by electrocution dies instantly, no matter how weak the

---

[23] Duff 119.

[24] Lawes 189; 1968 Hearings, at 20 (statement of Clinton Duffy).   "[T]he electrodes making contact may reach a temperature high enough to melt copper (1,940 degrees Fahrenheit) and . . . the average body temperature will be in the neighbourhood of 140 degrees Fahrenheit . . . ."   Lawes 188.

[25] Bedau 16; 1968 Hearings, at 20 (statement of Clinton Duffy).

[26] Lawes 188–189; Teeters 447–448.

[27] 1972 Hearings, at 305; Note, The Death Penalty Cases, 56 Calif. L. Rev. 1268, 1339 (1968).   "No one knows whether electrocuted individuals retain consciousness until dead . . . ."   1972 Hearings, at 306.   See also Bedau, General Introduction, in Capital Punishment 7, 17–18, 22–23 (J. McCafferty ed. 1972); G. Scott, The History of Capital Punishment 219 (1950).

[28] Teeters 447 (quoting Nicola Tesla).

subject may be. In certain cases death will not have come about even though the point of contact of the electrode with the body shows distinct burns. Thus, in particular cases, the condemned person may be alive and even conscious for several minutes without it being possible for a doctor to say whether the victim is dead or not. . . . This method of execution is a form of torture." [29]

Although it is an open question whether and to what extent an individual feels pain upon electrocution, there can be no serious dispute that in numerous cases death is far from instantaneous. Whether because of shoddy technology and poorly trained personnel, or because of the inherent differences in the "physiological resistance" of condemned prisoners to electrical current, see n. 29, *supra*, it is an inescapable fact that the 95-year history of electrocution in this country has been characterized by repeated failures swiftly to execute and the resulting need to send recurrent charges into condemned prisoners to ensure their deaths. [30] The very first electrocution required multiple attempts before death resulted, [31] and our cultural lore is filled with examples of at-

---

[29] Quoted in Duff 118–119. See also Lawes 187 ("[T]he resisting power of the human body is very high and it requires a voltage comparatively large or small, depending entirely upon the resistance and contacts, to force this amount of current through a circuit in which the body, with its contacts, constitutes the resistance").

[30] See Duff 122 ("Experience proves that human beings vary enormously in their powers of resistance to electrocution, which depends upon the strength of current and not upon voltage pressure: hence, *several shocks* may be required to produce what medical experts can reasonably define as death, which means that doctors have to stand by with stethoscopes at the ready to apply to the victim's chest when he or she has been given one or more doses of current") (emphasis in original).

[31] See generally Teeters 446–447; Beichman, 35 Commentary, *supra* n. 4, at 417–419. George Westinghouse, founder of Westinghouse Electric Company, "thought that the job could have been 'done better with an axe.'" Voices Against Death xxxii (P. Mackey ed. 1976) (hereinafter Voices Against Death). The New York Press asserted that "the age of burning at the stake is past; the age of burning at the wire will pass also." Beichman, *supra*, at 417. Another newspaper editorialized: "[I]t is not improbable that the first will prove the last . . . . Dr. E. A. Spitzka, the celebrated expert, who was present, unhesitatingly pronounced the experiment a failure and declared it his belief that the law should be repealed and no more experiments made with electricity as a means of execution." Teeters 446–447. A note in the Harvard Law Review from the time suggested that the judicial approval of electrocution

tempted electrocutions that had to be restaged when it was discovered that the condemned "tenaciously clung to life." [32] Attending physicians routinely acknowledge that electrocutions must often be repeated in order to ensure death. [33] It is difficult to

---

"might well be changed in the light of subsequent experiment." 4 Harv. L. Rev. 287 (1891).

[32] R. Elliott, Agent of Death 66 (1940) (hereinafter Elliott). See generally Bedau 15; Duff 121; J. Pritchard, A History of Capital Punishment 65 (1932); Teeters 448–449; Gardner, 39 Ohio St. L. J., *supra* n. 2, at 126; 1972 Hearings, at 305–306. Robert Elliott, Sing Sing's long-time electrocutioner, described in his memoirs a number of failed attempts to electrocute prisoners. See especially Elliott 57 ("Fred's heart, larger than that of any other person electrocuted up to that time, was still beating, and he was alive. There was only one thing to do: put him in the chair again, and pass current through his body until he was dead"); *id.*, at 66 (describing the execution of another condemned prisoner in which "six shocks [were] necessary before he was pronounced dead"); *id.*, at 147–148.

A noted instance of this phenomenon occurred when Ethel Rosenberg was electrocuted for treason: five consecutive attempts were required before she finally died. "After the *fourth* (shock) guards removed one of the two straps and the two doctors applied their stethoscopes. But they were not satisfied that she was dead. The executioner came to them from his switchboard in a small room 10 feet from the chair. 'Want another?' he asked. The doctors nodded. Guards replaced the straps and for the *fifth* time electricity was applied." Duff 122 (emphasis in original).

See also Howells, State Manslaughter, in Voices Against Death 152:

"It was not imagined that electricity could fail to kill instantly, much less that the criminal, who had become the State's peculiar care, could be so ineffectually tortured as to froth at the mouth, and strain at his bonds with writhings of agony which almost burst them, or give out the smell of his burning flesh so that the invited guest was often made sick at his stomach by the loathsome and atrocious fact. Yet all this has happened again and again in the execution of the death sentences since the consecration of the electric chair to the hallowed office of the axe, the noose, the screw. It has happened so often that I, at least, had become used to reading of it, and had tranquilly accepted it . . . . I generally managed to reconcile myself to the record of the frothing, and burning, and writhing, by learning further that the scientific gentleman, or the educated electrician, on the other side of the wall, had made it all right by discharging another thousand or two thousand volts into the body of his erring brother, and so putting him finally out of his misery."

[33] Dr. Amos Squires, for years the officiating doctor at electrocutions conducted at Sing Sing, observed that after "the current is cut off . . . the doctor with his stethoscope listens for heartbeats—*he listens to them grow fainter and fainter*. A brief interval passes. The switch is thrown again—and after contact is broken, again the doctor listens. *There is seldom any pulse this time*." Teeters 448 (emphasis added). See also *id.*, at 449 ("[I]t often takes

imagine how such procedures constitute anything less than "death by installments"—"a form of torture [that] would rival that of burning at the stake." *Louisiana ex rel. Francis* v. *Resweber*, 329 U. S., at 474, 476 (Burton, J., dissenting).[34]

This pattern of "death by installments" is by no means confined to bygone decades. Here is one eyewitness account of Alabama's electrocution of John Louis Evans on April 22, 1983:

> "At 8:30 p. m. the first jolt of 1900 volts of electricity passed through Mr. Evans' body. It lasted thirty seconds. Sparks and flames erupted from the electrode tied to Mr. Evans' left leg. His body slammed against the straps holding him in the electric chair and his fist clenched permanently. The electrode apparently burst from the strap holding it in place. A large puff of greyish smoke and sparks poured out from under the hood that covered Mr. Evans' face. An overpowering stench of burnt flesh and clothing began pervading the witness room. Two doctors examined Mr. Evans and declared that he was not dead.
>
> "The electrode on the left leg was refastened. At 8:30 p. m. *[sic]* Mr. Evans was administered a second thirty sec-

---

several shocks of high voltage to finally convince the attending physician—who often must rely on the executioner himself to give the nod—that the victim is actually dead").

[34] Louisiana's execution of Willie Francis remains the most notorious example of the botched manner in which so many electrocutions have been conducted. See generally L. Berkson, The Concept of Cruel and Unusual Punishment 26–29 (1975); B. Prettyman, Death and the Supreme Court 90–128 (1961). Sheriff Harold Resweber described the first attempted electrocution as follows:

"Then the electrocutioner turned on the switch and when he did Willie Francis' lips puffed out and he groaned and jumped so that the chair came off the floor. Apparently the switch was turned on twice and then the condemned man yelled: 'Take it off. Let me breath *[sic].*'" 329 U. S., at 480, n. 2 (Burton, J., dissenting).

Another witness gave this account of the aborted attempt:

"I saw the electrocutioner turn on the switch and I saw his lips puff out and swell, his body tensed and stretched. I heard the one in charge yell to the man outside for more juice when he saw that Willie Francis was not dying and the one on the outside yelled back he was giving him all he had. Then Willie Francis cried out 'Take it off. Let me breath *[sic].*' Then they took the hood from his eyes and unstrapped him. . . . This boy really got a shock when they turned that machine on." *Ibid.*

ond jolt of electricity. The stench of burning flesh was nauseating. More smoke emanated from his leg and head. Again, the doctors examined Mr. Evans. The doctors reported that his heart was still beating, and that he was still alive.

"At that time, I asked the prison commissioner, who was communicating on an open telephone line to Governor George Wallace to grant clemency on the grounds that Mr. Evans was being subjected to cruel and unusual punishment. The request for clemency was denied.

"At 8:40 p. m., a third charge of electricity, thirty seconds in duration, was passed through Mr. Evans' body. At 8:44, the doctors pronounced him dead. The execution of John Evans took fourteen minutes." [35]

Similarly, this was the scene at Georgia's electrocution of Alpha Otis Stephens just last December 12th:

"The first charge of electricity administered today to Alpha Otis Stephens in Georgia's electric chair failed to kill him, and he struggled to breathe for eight minutes before a second charge carried out his death sentence for murdering a man who interrupted a burglary.

.      .      .      .      .

". . . A few seconds after a mask was placed over his head, the first charge was applied, causing his body to snap forward and his fists to clench.

"His body slumped when the current stopped two minutes later, but shortly afterward witnesses saw him struggle to breathe. In the six minutes allowed for the body to cool before doctors could examine it, Mr. Stephens took about 23 breaths.

"At 12:26 A. M., two doctors examined him and said he was alive. A second two-minute charge was administered at 12:28 A. M." [36]

Stephens "'was just not a conductor' of electricity, a Georgia prison official said." [37]

---

[35] Affidavit of Russell F. Canan (June 22, 1983), attached to Pet. for Cert.
[36] N. Y. Times, Dec. 13, 1984, p. A18, cols. 1–4.
[37] N. Y. Times, Dec. 17, 1984, p. A22, col. 1.

Thus there is considerable evidence suggesting—at the very least—that death by electrocution causes far more than the "mere extinguishment of life." *In re Kemmler*, 136 U. S., at 447. This evidence, if correct, would raise a substantial question whether electrocution violates the Eighth Amendment in several respects. First, electrocution appears to inflict "unnecessary and wanton . . . pain" and cruelty, and to cause "torture or a lingering death" in at least a significant number of cases. *Gregg* v. *Georgia*, 428 U. S., at 173 (opinion of Stewart, POWELL, and STEVENS, JJ.); *In re Kemmler, supra*, at 447. Second, the physical violence and mutilation that accompany this method of execution would seem to violate the basic "dignity of man." *Trop* v. *Dulles*, 356 U. S., at 100 (plurality opinion). Finally, even if electrocution does not invariably produce pain and indignities, the apparent century-long pattern of "abortive attempts" and lingering deaths suggests that this method of execution carries an unconstitutionally high risk of causing such atrocities. *Louisiana ex rel. Francis* v. *Resweber*, 329 U. S., at 471 (Frankfurter, J., concurring); see also n. 11, *supra*. These features of electrocution seem so "inherent in [this] method of punishment" as to render it *per se* cruel and unusual and therefore forbidden by the Eighth Amendment. *Louisiana ex rel. Francis* v. *Resweber, supra*, at 464.

Moreover, commentators and medical experts have urged that other currently available means of execution—particularly some forms of lethal gas and fast-acting barbituates—accomplish the purpose of extinguishing life in a surer, swifter, less violent, and more humane manner.[38] Several state legislatures have abandoned electrocution in favor of lethal injection for these very reasons; one of the architects of this change has emphasized that it resulted precisely from the recognition that the electric chair is "a barbaric torture device" and electrocution a "gruesome ritual."[39] Other States have rejected electrocution in favor of the use of lethal gas.[40]

For me, arguments about the "humanity" and "dignity" of *any* method of officially sponsored executions are a constitutional

---

[38] See Bedau 18; Gardner, 39 Ohio St. L. J., *supra* n. 2, at 110–113; see also Royal Commission Report ¶¶ 735–749, at 256–261.

[39] Gardner, 39 Ohio St. L. J., *supra* n. 2, at 126–127, n. 228 (quoting Texas Rep. Ben Grant).

[40] *Id.*, at 127.

contradiction in terms. See *supra*, at 1080. Moreover, there is significant evidence that executions by lethal gas—at least as administered in the gas chamber[41]—and barbituates—at least as administered through lethal injections[42]—carry their own risks of pain, indignity, and prolonged suffering. But having concluded that the death penalty in the abstract is consistent with the "evolving standards of decency that mark the progress of a maturing society," *Trop* v. *Dulles*, 356 U. S., at 101 (plurality opinion), courts cannot now avoid the Eighth Amendment's proscription of "the unnecessary and wanton infliction of pain" in carrying out that penalty simply by relying on 19th-century precedents that appear to have rested on inaccurate factual assumptions and that no longer embody the meaning of the Amendment. *Gregg* v. *Georgia, supra*, at 173 (opinion of Stewart, POWELL, and STEVENS, JJ.). For the reasons set forth above, there is an ever-more urgent question whether electrocution in fact is a "humane" method for extinguishing human life or is, instead, nothing less than the contemporary technological equivalent of burning people at the stake.

---

[41] See, *e. g.*, 1968 Hearings, at 21; 1972 Hearings, at 306–307; Teeters 451–455; Gardner, 39 Ohio St. L. J., *supra* n. 2, at 127–128.

[42] See, *e. g.*, *Chaney* v. *Heckler*, 231 U. S. App. D. C. 136, 139–140, 718 F. 2d 1174, 1177–1178 (1983), rev'd, 470 U. S. 821 (1985); Royal Commission Report ¶¶ 737–749, at 257–261; Gardner, 39 Ohio St. L. J., *supra* n. 2, at 128–129.